Davide R. GRASSETTI, Ph.D.,
Plaintiff-Petitioner,

v.

Casper W. WEINBERGER, Secretary of
the United States Department of
Health, Education and Welfare, et al.,
Defendants-Respondents.

No. C–75–1198 SC.

United States District Court,
N. D. California.

Feb. 10, 1976.

Withy, Gould, Miller & Haptas, Berkeley, Cal., Van Bourg, Allen, Weinberg, Williams & Roger, San Francisco, Cal., for plaintiff-petitioner.

U. S. Atty. James L. Browning, William T. McGivern, Jr., Asst. U. S. Atty., San Francisco, Cal., for defendants-respondents.

## ORDER

CONTI, District Judge.

Plaintiff Davide R. Grassetti, Director of Research for the Arequipa Foundation, San Francisco, Clinical Associate Professor of Biochemistry, School of Dentistry, University of the Pacific, San Francisco, and holder of a Ph.D. degree in chemistry from the University of Lausanne, Switzerland, brings this action against various individuals associated with the federal government's cancer re-

search program, alleging that at their hands he received unfair treatment in their denial of research grant money to enable him to study and develop a certain chemical compound, CPDS,[1] and a family of compounds related thereto, which he discovered, and which he claims "impede the spread of existing cancer."[2] He labels their decisions to disapprove his grant applications arbitrary and capricious and without factual foundation, and as being the product of invidious discrimination practiced against him because, *inter alia,* he held patents covering the series of compounds, and he had made various public statements, some of which were critical of National Cancer Institute funding procedures, and others which tended to disparage an FDA–approved antibiotic known as Rifampicin.[3]

In addition to the challenges brought against the disapprovals of his grant applications, Grassetti alleges that the defendants arbitrarily refused adequately to test CPDS for its alleged anti-metastatic effects,[4] or to provide for its testing by others, in order that it could be considered for possible development by other scientists if the government would not fund plaintiff to do so. Further, he makes general claims that various agencies within the National Institutes of Health (NIH), which are charged by Congress with the responsibility of waging a comprehensive war on cancer, are failing to do so, in contravention of the statutory mandates. The crux of this contention as it relates to the instant controversy seems to be that since the government's cancer research apparatus has "blocked" the development of plaintiff's life-prolonging drug for improper reasons or for no reasons at all, the agencies and individuals responsible are not living up to their statutory duty, as plaintiff states it, "to comprehensively and energetically exploit scientific leads which may aid in the treatment of cancer".[5] One specific violation of this duty is purported to lie in defendants' failure to promulgate regulations which set forth specific guidelines and standards to be applied in the process by which applications for cancer research grants are reviewed for scientific merit. Had such regulations been in existence, asserts plaintiff, there would have been no opportunity for the kind of arbitrary and discriminatory treatment to which his grant applications allegedly were subjected. Finally, plaintiff challenges the entire administrative scheme which allocates, as between the NIH and the National Cancer Institute (NCI), decision-making power in the area of scientific review of grant applications. These claims will be dealt with in detail below.

Dr. Grassetti asks this court to grant several types of relief: (1) to declare that it is the legal duty of the National Cancer Institute diligently to pursue every avenue that could lead to an advancement in the cure or treatment of cancer, and that therefore it is that agency's duty to test or provide for testing of any material that has been shown

1. "CPDS", or carboxypridine disulphide, according to plaintiff, retards the growth or spread of cancer by reacting with cancer cells in such manner as to form a stable compound on the surface of such cell. In a sense, then, the theory of the anti-metastatic (or anti-growth or spread) mechanism of CPDS is that it forms a hard wall around cancer cells, which does not admit of further growth.

2. See Complaint at p. 1.

3. Some biomedical theorists suggest, Dr. Grassetti among them that Rifampicin actually favors the formation of metastases (or secondary cancer tumors) due to its immunosuppressant properties. See Attachments 1 and 2 to Plaintiff's Supplemental Response to Defendants' Motion for Summary Judgment. Plaintiff made several public statements expressing his beliefs in 1972 and 1973 in an attempt to bring them to the attention of the FDA and Institutes of Health. National Cancer Institute testing of the drug gave negative results.

4. Metastasis is the growth or spread of cancer cells. Dr. Grassetti claims that the National Cancer Institute's screening of compounds submitted for anti-cancer testing is inadequate in that only toxicity and anti-tumor activity, and not anti-metastatic activity, are measured, and thus that CPDS did not get a fair chance to exhibit positive beneficial results. This matter is taken up in part IV.B. *infra.*

5. See Complaint at p. 6.

to be effective in treating the causes or spread of cancer; (2) to issue an injunction ordering the agencies responsible to comply with their statutory duty to test his compounds or provide for testing by others; (3) to direct the agencies responsible properly to evaluate his grant applications for scientific merit, under a procedure free from the taint of the discriminatory and arbitrary animus with which his prior applications allegedly were confronted; (4) to order defendants to promulgate regulations setting down specific scientific guidelines to be followed in evaluating grant applications for scientific merit, and, prior to the time such regulations are promulgated, to refrain from acting upon or processing any further grant proposals, and to suspend disbursements on grant proposals from other scientists previously approved in order that it may be determined whether approval was given in a proper, non-arbitrary and non-discriminatory fashion; (5) to order removed from decision-making functions in the grant review process individuals purportedly having conflicts of interest; (6) to order defendants to treat plaintiff as a "sole source contractor rather than a "grantee", or, in the alternative, to declare illegal all Department of Health, Education and Welfare (HEW) and National Cancer Institute regulations which discriminate against "grantees" in favor of "contractors"; (7) to order the National Cancer Advisory Board (NCAB) to "give a fair and adequate review to all grant applications presented to it"; (8) to order the President's Cancer Panel (PCP) to perform its duty to bring to the attention of the President all "delays, blockages, or other deficiencies" in the government's cancer program; and (9) to order defendants to disclose to plaintiff all records, documents, and files pertaining to him and to his grant applications.

Plaintiff seeks judicial review in this court as a "person adversely affected or aggrieved by agency action" within the meaning of Section 10 of the Adminis-

trative Procedure Act, 5 U.S.C. § 702, that action having been undertaken by the responsible agencies pursuant to a statutory grant of authority found in the National Cancer Act of 1971, as amended, 42 U.S.C. §§ 281 through 286g. Plaintiff also seeks disclosure of various documents concerning the review and disposition of his grant applications, pursuant to the Freedom of Information Act, 5 U.S.C. § 552. The defendants are the Secretary of the Department of Health, Education & Welfare (HEW), the Director of the National Cancer Program, the Director of the National Institutes of Health, all members of the National Cancer Advisory Board, all members of the President's Cancer Panel, and the members of a "special study section" which was charged with the responsibility of evaluating one of plaintiff's grant applications. The matter is before the court on defendants' alternative motions for dismissal or summary judgment.

## I. *Facts*

Over the past several years, Dr. Grassetti has applied on numerous occasions for grant support in the areas of chemistry, pharmacology, and cancer, and has several times been successful in receiving funds.[6] The last award was made in the amount of $105,850 for the period October 1, 1971, through September 30, 1973, on an application entitled "Prevention of the Spread of Cancer", under which Dr. Grassetti was to study and document the chemical and pharmacological properties of CPDS and related compounds as they affect the growth of cancer. On April 6, 1973, as the above grant was nearing the end of its term, Dr. Grassetti submitted an application (CA 12469–03A1) in order to obtain additional funds in the amount of $538,041 for five years to continue his research and exploration of the same family of compounds, the specific purpose of the new request being "to determine the precise mechanism through which the spread of cancer is prevented by this type of compound."[7] Consistent

---

**6.** See Attachment 6 to Affidavit of Dr. Richard A. Tjalma of Defendants' Motion for Summary Judgment.

**7.** See attachment I to Dr. Tjalma's Affidavit.

with the procedure which is followed by NIH upon receipt of grant applications, see *infra*, plaintiff's application was sent for scientific merit review to a study section chosen for its particular expertise in the technical field concerned—in this case, the Experimental Therapeutics Study Section. This proposal was reviewed during the Section's September, 1973, meeting, and disapproval was unanimously recommended to the National Cancer Advisory Board "because of the lack of meaningful progress in Dr. Grassetti's research and his failure to follow previous Study Section recommendations relative to obtaining data to support the biological and pharmacological aspects of his research".[8] Dr. Grassetti was subsequently advised of the Study Section's recommendation.

Dr. Grassetti submitted another research proposal on October 1, 1973 (CA 16150–01) which the Division of Research Grants (DRG) of the NIH, see *infra*, determined to be not significantly different from the April 6, 1973, proposal (CA 12469–03A1) previously reviewed by the Experimental Therapeutics Study Section. DRG did not, therefore, send this proposal on to that Study Section or to another for review, but rather ruled that further review would be repetitious.[9] Having been advised of this disposition, Dr. Grassetti sent a letter to all members of the NCAB expressing disappointment; nevertheless, the NCAB at its November, 1973, meeting concurred with the Study Section's recommendations concerning application CA 12469–03A1, and, by necessary implication (assuming the DRG's assessment of CA 16150–01 was correct), the latter application as well.

On March 11, 1974, another application, entitled "Metastasis Prevention by Cell Surface Modification" (CA 16150–01A1), was submitted by plaintiff. In view of Dr. Grassetti's expressed dissatisfaction with the recommendations of the Experimental Therapeutics Study Section concerning the earlier proposal, a Special Study Section was formed, composed of five scientists with expertise in relevant fields, none of whom were members of the Experimental Therapeutics Study Section, who conducted a visit of Dr. Grassetti's laboratory at the University of the Pacific to obtain first-hand information concerning plaintiff's facilities and research support, in the light of which the grant application could be comprehensively evaluated. Following their scientific review of this latest proposal, the Section unanimously recommended that the application be disapproved, which decision was communicated to plaintiff. Plaintiff thereupon requested of the Executive Secretary of the NCAB that he be allowed to make an oral presentation at the next NCAB meeting. While this request was denied, in the exercise of the Board's discretion over the scope and content of its proceedings, plaintiff was informed that he could submit a written statement which would be circulated to the Board's members. So far as the record shows, plaintiff submitted no such statement.

Upon further requests by Dr. Grassetti for the NCAB to conduct a special review of his latest application (CA 16150–01A1),[10] the Chairman of the Board appointed two members to conduct an independent review of the administrative details of the Special Study Section's actions. These doctors reported to the NCAB that "the administrative peer review procedures followed by both the Special Study Section and the NCI staff were proper and fair."[11]

On December 27, 1974, plaintiff submitted a further grant application (CA 16150–01A2) entitled "Mechanism of Mestastasis Prevention", which was re-

---

8. See Dr. Tjalma's Affidavit, at par. 19.

9. See Attachment L to Dr. Tjalma's Affidavit.

10. During this period, Dr. Grassetti sent letters to the members of the President's Cancer Panel and his Congressmen expressing his belief that he was being arbitrarily denied funding on his grant applications. This was in addition to several exchanges with officials in NIH and NCI.

11. See Attachment S to Dr. Tjalma's Affidavit.

viewed by the Experimental Therapeutics Study Section during its April, 1975, meeting, and unanimously recommended by that Section for disapproval by the NCAB. That recommendation was followed. Shortly thereafter, plaintiff requested and received a report of the Study Section's reasons for its action, which stated in part that "lack of detail in [the application] was indicative of a lack of appreciation by Dr. Grassetti for biomedical and pharmacological studies." [12]

Concurrent with plaintiff's various submissions of grant proposals, he sent to NCI several compounds for testing, among them CPDS, which were screened for anti-cancer activity, without significant positive results.[13]

## II. *The Issues*

While the instant complaint, its prayer for relief and the supporting papers are extremely prolix and wide-ranging, it is the opinion of this court that the issues meritorious of our consideration separate along two major lines of inquiry, the first having several subparts.

First, we must consider whether the various administrative determinations respecting plaintiff's grant applications were made in accordance with law. Resolution of this issue necessarily includes consideration of plaintiff's allegations of (1) conflicts of interest on the part of scientists assigned to evaluate the applications, (2) discrimination against plaintiff because he had patents, (3) discrimination against plaintiff because of his exercise of rights guaranteed by the First Amendment, (4) defendants' failure to promulgate adequate regulations as required by law setting forth standards for scientific review, (5) the NCI's and the NCAB's improper delegation of scientific merit review functions to the Division of Research Grants (DRG) of NIH,

and (6) defendants' refusal to make full disclosure to plaintiff of the contents of all reports, documents and files concerning his grant applications, as he claims is required by the Freedom of Information Act.

Second, independent of the relationship between the various agencies and plaintiff as a grant applicant, we must consider whether the federal agencies and individuals charged under the National Cancer Act with various responsibilities in administering the government's war on cancer have lived up to their statutory duties in their handling of the chemical compounds submitted by plaintiff for testing.

Resolution of the important issues raised by the first inquiry necessarily requires a complete understanding of the administrative and scientific schemata pursuant to which a grant application is evaluated and a decision whether or not to fund it is made. This background will be presented first. The court will then pass to the testing issue.

## III. *The Grant Application Review Process*

### A. *Statutes and Regulations:*

Subchapter III of Title 42 of the U.S. Code provides the statutory framework for the formation of the National Research Institutes, one of which is the National Cancer Institute, created under Part A, 42 U.S.C. §§ 281–286g. The NCI is a division of the National Institutes of Health, which is composed of ten other institutes and various support divisions, all dedicated to research and development activities in the area of public health and welfare. NIH is in turn a component of the Public Health Service, a part of the Department of Health, Education and Welfare (HEW).

---

**12.** See Attachment W to Dr. Tjalma's Affidavit.

**13.** See Attachment Y and Z to Dr. Tjalma's Affidavit.

Section 301(c) of the Public Health Service Act, 42 U.S.C. § 241(c), authorizes the Secretary of HEW [14] to:

Make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals for such research projects as are . . ., with respect to cancer, recommended by the National Cancer Advisory Board . . .

The award of research grants under the above provision is governed by 42 C.F.R. Part 52. With respect to evaluation and disposition of research grant applications, 42 C.F.R. § 52.13(a) states:

(a) Evaluation. All applications filed in accordance with § 52.12 shall be evaluated by the Secretary through such officers and employees and such experts or consultants engaged for this purpose as he determines are specially qualified in the areas of research involved in the project, including review by an appropriate National Advisory Council or other body as may be required by law. The Secretary's evaluation shall take into account among other pertinent factors the scientific merit and significance of the project, the competency of the proposed staff in relation to the type of research involved, the feasibility of the project, the likelihood of its producing meaningful results, the proposed project and the amount of grant funds necessary for completion, and in the case of applications for support of research in emergency medical services, special consideration shall be given to applications for grants for research relating to the delivery of emergency medical services in rural areas.

In the case of cancer research grant applications, the direct costs of which do not exceed $35,000, the Director of NCI, under procedures approved by the Director of NIH, may approve grants after "appropriate review for scientific merit" without the necessity for review and recommendation by the NCAB. Where direct costs exceed that figure, the NCAB must review and recommend approval to the Director of NCI. See 42 U.S.C. § 282(b)(1) and (2). In this manner, requests for small grants can receive expedited treatment. See 1971 *U.S.Code Congressional & Administrative News,* pp. 2356-57. When the NCAB recommends approval, it in effect certifies to the Secretary of HEW that the application "show[s] promise of making valuable contributions to human knowledge with respect to the cause, prevention, or methods of diagnosis or treatment of cancer". 42 U.S.C. § 284(c). The NCAB's decision to approve reflects the Board's assessment of the proposal's technical and scientific merit as well as its determination that the proposed project fits into the NCI's mission and research priorities and into the total pattern of research in universities and other institutions. The determination whether or not to grant funding must still be made after approval of the Director of NCI, on the basis of budget and priorities existing within the Institute as a whole, by the Secretary of HEW, who considers the Institute's own assessment of the application, in light of Institute policies and program priorities and availability of appropriations. The power to make a final decision is, by operation of the statutory scheme, lodged in the Secretary, HEW.[15]

B. *Administrative Grant Application Processes within NIH.*

Applications for research grants received at NIH, are sent to the NIH's Division of Research Grants, which normally assigns them to one of a number of regularly constituted advisory committees (referred to as "study sections")

---

14. While many of the pertinent Public Health Service Act provisions continue to refer to the Surgeon General, all the functions of that office were transferred to the Secretary, HEW, by 1966 Reorganization Plan No. 3, 31 F.R. 8855, 80 Stat. 1610, effective June 25, 1966.

15. While the Secretary, HEW, is authorized to "make" grants-in-aid, see 42 U.S.C. § 241, the Director, NCI "may approve" such grants, see 42 U.S.C. § 282(b).

responsible for initial scientific review and recommendation. At the same time, DRG designates the appropriate awarding unit or Institute (such as NCI), to which the proposed research grant application will be referred. DRG makes the study section assignments and the awarding unit designation on the basis of the scientific or technical area into which the application's subject matter falls. Often, of course, the subject of a given application reaches across many technical disciplines, in which case an ad hoc study group may be formed, composed of scientists and biomedical experts from all relevant areas of technical expertise. In such a case DRG designates more than one Institute as the appropriate awarding units. It is presumably in response to the obvious need for coordination of all research activities within NIH that a central clearing house of grant applications, namely DRG, is maintained separate from any particular Institute.[16]

The scientist administrators in DRG who assign applications to study sections are organizationally separate from the Institutes and their programs. Each study section is made up of experts in the biomedical sciences and other scientific areas relevant to the particular inquiry, who come, with few exceptions, from universities and other organizations outside the federal government.

Following the initial study section review a "summary statement" is prepared by the executive secretary, a DRG staff member, in which the salient features of the members' deliberations, recommendations, and substantive conclusions relating to the application are documented. Upon request, the applicant is provided with reasons abstracted from the "summary statement" for the action recommended on the application.[17]

The study section's recommendation on the application represents an assessment of scientific and technical merit only. It

is not intended as a competitive review in relation to other applications being reviewed by the same group or other groups. If approval is recommended, the study section is required to assign to the application a rating of its scientific merit, which can aid the appropriate national council (such as the NCAB) in making its decision on relative priorities of approved projects.

Whether the study section advises approval or disapproval, the recommendation as to cancer research proposals goes to the NCAB, which, considering not only technical merit but also the needs of the Institute and NIH as a whole, the need for the initiation of research in new areas, the degree of relevance of the proposed research to the mission of the Institute, and other matters of policy, can make an independent decision on the application. If the study section has recommended disapproval, the NCAB can "remand" for reconsideration, or simply recommend approval in the exercise of its own judgment. Applications, with their attached study section recommendations, are reviewed by the NCAB at three of its four yearly meetings, in March, June and November. The October NCAB meeting is generally reserved for review of ongoing NCI research programs.

As noted, NCAB approval is communicated to the Director, NIH and eventually the Secretary, HEW, who makes the final decision and disburses the funds.

## IV.  The Law Governing Plaintiff's Claims.

### A.  Denial of Research Funding.

In this aspect of the case, plaintiff is basically alleging that the administrative determinations made by first the study sections and eventually the NCAB, the Director, NIH, and the Secretary, HEW, in disapproving his grant applications were arbitrary, discriminatory, without factual basis, were made as a reprisal for

---

**16.**  This allocation of decision-making functions is challenged by plaintiff in this action. See discussion *infra* at part IV.A.(3).

**17.**  Summary statements are not, however, made public. See 5 U.S.C. § 552(b)(4), (5), and (6) and discussion *infra*.

his exercise of his First Amendment rights or because he held patents on his chemical compounds and thus constituted an abuse of administrative discretion.

■ These charges require the court to inquire into whether it is given jurisdiction to review such an administrative determination, and, if so, the scope of that review. The answer is found in the provisions of the Administrative Procedure Act dealing with judicial review of administrative action, namely, 5 U.S.C. §§ 701 and 702. Section 702 states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

> Section 701(a) states, in pertinent part:

> This chapter applies . . . except to the extent that—

> (1) statutes preclude judicial review; or

> (2) agency action is committed to agency discretion by law.

Since neither the Public Health Service Act nor the National Cancer Act contains any provision expressly precluding review, jurisdiction exists here to the extent that the action undertaken ultimately by the Secretary, HEW, is not of a type committed to his agency's or his delegate agency's discretion by law. See 4 Davis, *Admin.Law,* § 28.16.

While we need not go so far as to decide the question, it is probable that the medical merits of agency decisions on research grant applications are committed to the unreviewable discretion of the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a constitutional guarantee or violated an express statutory or procedural directive. See, e. g., *Apter v. Richardson,* 510 F.2d 351 (7th Cir. 1975); *Kletschka v. Driver,* 411 F.2d ·436 (2d Cir. 1969); *Cappadora v. Celebrezze,* 356 F.2d 1 (2d Cir. 1966); see generally, Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion", 82 Harv.L.Rev. 367 (1968). In cases such as these, and the one at bar here, were a substantial evidence or abuse of discretion standard held to apply, the result would be to place a tremendous burden on the courts to digest masses of technical data before it could be decided that one grant application was so superior that it was an abuse of discretion to reject it in favor of others. A much more important consideration is that, unfortunate as it might be, it is a fact of life that courts are simply not competent to step into the role of a medical research scientist faced with having to evaluate an applicant's technical expertise the theoretical chemical and pharmacological underpinnings of his study methodology, the statistical validity of his test results and the conclusions drawn therefrom, or just about any other factor of importance to NCI in deciding who should get its research money. But in this court's opinion the preeminent consideration militating against general judicial review of research grant decisions is that such review would place a heavy burden of litigation on an agency with more important matters at hand, would delay the funding process to the detriment of potential grantees, and would perforce place in jeopardy a program designed to combat cancer.

Even assuming, however, that a substantial evidence standard should be applied, it is amply satisfied here. Some of the reasons given for the denial of research funds were that: (1) The application "indicates a lack of appreciation for experiments which should be conducted, and those which have been done have in nearly every respect been inadequately presented both in the application and in the discussion during the site visit. There are serious questions of the significance and reproducibility of the test system, as used here, to detect effects upon metastases and the entire program is dependent upon this;" (2) Proposed experiments to determine, among other things, the interaction of CPDS with the surface of cancer cells, were presented "in a diffuse way with the details either not settled upon or not presented in a manner

to permit evaluation;" (3) "There are reservations on the chemical interpretation of what the principal investigator observes in his studies in cellular systems . . ." Plaintiff's interpretations of the relevant chemical phenomena were in many cases contrary to hard results obtained by other experimenters; (4) "In summary, the results are interesting, however, appropriate design of experiments has not been made and a rather naive chemical view of the reaction of CPDS (or related derivatives) with cells has been adopted. The applicant failed to present well thought out ideas about his short-term goals and did not project the insight to pursue a longer term planned series of experiments to warrant project support. It does not appear that he is familiar with the chemistry of unsymmetrical disulfides nor the principles which govern their reactions. This proposal did not generate confidence that the applicant could work with chemically modified macromolecules in a careful and meaningful series of experiments." See particularly, Attachments O and W to Affidavit of Richard A. Tjalma, Assistant Director for Board and Panel Affairs, NCI, Defendants' Motion for Summary Judgment. The record more than adequately shows that the determination to disapprove the applications was made after careful review by expert medical and scientific professionals, who, in the exercise of their best technical judgment, simply were not satisfied that the proposals had such scientific merit as to justify funding.

The court's only legitimate function in a case such as this is the extremely limited one of insuring that the agency's determination was arrived at through procedures which were reasonable and fair. After a careful review of the record, the court finds that there was no deviation here from the usual procedures under which grant applications are processed, that those procedures, which have been in existence for a number of years in NCI and NIH, are eminently fair in guaranteeing to the maximum extent possible that the best

ideas in the field of cancer research are highlighted for government support, and that notwithstanding plaintiff's allegations to the contrary, the administrative decision here is sufficiently supported by the medical and scientific evidence. This case bears striking similarity to *Kletschka,* supra, in which the court upheld a denial of research funds in affirming the district court's grant of defendants' motion for summary judgment, against plaintiff's charge that the agency action was undertaken in retaliation against him for his having exercised certain of his legal rights. *Id.* at 441–42.

Apart from the reviewability or nonreviewability of the decision not to award plaintiff a grant, however, plaintiff charges that the defendants' action constituted certain violations of law, as to which a reviewing court may take cognizance and in the appropriate case, substitute its own judicial judgment as to what the law is and whether a violation has occurred. See 4 Davis, *Administrative Law* § 30.01 et seq. Specifically, plaintiff has charged (1) that certain individuals who had a part in reviewing his applications were acting with conflicts of interest, violative of 18 U.S.C. § 208, 43 C.F.R. § 73.735–1202, and Executive Order 11222, including Section 302 thereof; (2) that the National Cancer Act, specifically Section 410A thereof, 42 U.S.C. § 286e, requires the Director, NCI, to promulgate certain regulations, which he has not done; and (3) that the delegation by NCI to the Division of Research Grants, NIH, of initial responsibility for review of grant applications is violative of the express provisions of the National Cancer Act whereunder scientific review is to be accomplished by NCI and not by NIH or its divisions. We now turn to these contentions.

(1) The conflict of interest provisions above require that one with a financial interest in the outcome of a given decision to be made by a government agency not be allowed to contribute in any way to making that decision. Plaintiff claims that the three members of the study

group which initially evaluated application CA 16150–01A1 in May of 1974 were acting with conflicts of interest in that these individuals or the institutions with which they were associated were recipients of NCI funded grants. Suffice to say that this fact in itself does not create a conflict of interest within the meaning of the relevant statutes and regulations. In no way would the individuals involved benefit financially by denying grant money to Dr. Grassetti, unless it be argued that their denial to him would leave more money in the pot for future proposals from themselves, a possibility of conflict of interest which the court deems to be much too remote. As a practical matter, high-level cancer research probably cannot be carried forward with the kind of vigor needed to solve this important and complex problem without government funding on a large scale; and probably in some way every doctor or scientist meeting the extremely high standards of technical competence required to be named to a study group has in the past been or is in the present on the receiving end of government support.

Putting this issue in its correct context, conflicts of interest in the grant review process would arise when a study section or NCAB member contributed to a decision as to whether to award himself or his institution a funding grant. This is assiduously avoided by NIH, NCI and NCAB policies and directives which disqualify such individuals from serving on study groups or being in attendance at NCAB meetings during which the individual's or his institution's proposal is being discussed and reviewed. See Release 4506, NIH Manual, "Review of Research Grant Applications" at par. G.1.b. and Attachment E to Affidavit of Dr. Tjalma, Defendants' Motion for Summary Judgment.

■ The court finds the above procedures designed to avoid conflicts of interest in the grant application review process adequate and reasonable, and finds that there was no violation of law in defendants' actions with respect to Dr. Grassetti's applications.

(2) Section 410A of the National Cancer Act, as amended, 42 U.S.C. § 286e(a) states:

The Director of the National Cancer Institute shall, by regulation, provide for proper scientific review of all research grants and programs over which he has authority (1) by utilizing, to the maximum extent possible, appropriate peer review groups established within the National Institutes of Health and composed principally of non-Federal scientists and other experts in the scientific and disease fields, and (2) when appropriate, by establishing, with the approval of the National Cancer Advisory Board and the Director of the National Institutes of Health, other formal peer review groups as may be required.

Subsection (b) directs the Director, NCI, to prepare annual reports to the President for transmittal to the Congress on the "activities, progress, and accomplishments" under the National Cancer Program.

Citing subsection (a), plaintiff asserts that the Director, NCI, has failed to obey the duty contained therein by virtue of his not having promulgated a regulation providing objective standards and criteria under which applications for research grants can be reviewed for scientific merit.

This contention is without merit. First, as a matter of statutory construction, it is by no means clear that subsection (a) requires such a regulation. The thrust of the provision seems to cover only existing grants and programs, that is to say, those as to which a decision to fund has been made and which at that point actually constitute an element of the National Cancer Program's research activities. This would not include potential grants, those as to which a decision to fund has not been made. Support for this construction is found in subsection (b) in that the duties placed on the Director, NCI, in subsection (a) seem to look to the requirement that that official make an annual comprehensive report on on-going activities and accomplishments

to the President and Congress. The Director must have some means of apprising himself of these activities, through the mechanism of scientific review thereof.

It is not necessary to so hold, however, because in the opinion of this court, the Director, NCI, has, in fact, promulgated regulations governing review for scientific merit, through NIH and its grant application review component, DRG. See Referral Handbook, NIH, DRG (Attachment A to Tjalma Affidavit, Defendants' Motion for Summary Judgment); Orientation Handbook for New Members of Study Sections, NIH, DRG (Attachment B to Tjalma Affidavit); Releases 4506 and 4507, NIH Manual, "Review of Research Grant Applications" and "Exchange of Information between Initial Review Groups and Awarding Units" (Attachment C to Tjalma Affidavit); Handbook for Executive Secretaries, 3d ed., NIH, DRG (February 1973) (Attachment D to Tjalma Affidavit). The court finds that the guidelines for scientific merit review contained in these publications go just about as far as is practicably possible in setting forth "objective criteria" for evaluations on scientific bases. What the plaintiff seems to request is something much more specific in the way of exact pre-established standards for deciding a proposal has the requisite "scientific merit" to justify funding it. As a scientist, plaintiff surely realizes that a great deal of independent scientific judgment must go into an assessment of a given proposal, and that hard and fast rules against which can be tested "scientific merit" simply do not exist. The only way there can be assurance that those proposals with "scientific merit" are recommended for funding and those without it are not, is to pick the best qualified experts in the relevant technical fields to make the decision on the basis of their well-informed judgment. There is absolutely no indication in the record that NIH is doing other than that, and plaintiff has made no challenge of the credentials of the scientists assigned to evaluate his proposals.

In view of the foregoing, the court holds that defendant Director, NIH, has in Dr. Grassetti's case complied in every respect with the law, particularly section 410A of the National Cancer Act.

(3) Plaintiff also challenges the delegation by NCI of initial review for scientific merit to NIH and its component, DRG. Plaintiff's position basically is that NCI and NCAB should perform the entire review function where research proposals in the cancer area are concerned. Plaintiff cannot reasonably challenge the use of peer groups for initial review purposes, given the strong congressional approbation their use received, as is shown in the legislative history. See 1971 U.S.Code Congressional & Administrative News, pp. 2356–57. It is also evident from that history that Congress contemplated the coordination of all health-related research by a group within NIH:

One of the important concerns of the biomedical research community had to do with preserving the integrity of the peer review system now applied across all biomedical research areas. The concern, expressed by a number of witnesses before the Committee, was that the latitude allowed in the Senate bill for the creation of special cancer review bodies would lead to the development of two peer review systems applying disparate standards; and that, further, a dual system in this area would effectively fragment the biomedical research community.

. . . . .

The hazards of evaluating the scientific merit of research projects are many, but the Committee has received abundant testimony that no system has yet surpassed the study section system of the National Institutes of Health in assuring that high standards of quality and scientific merit—in addition to program relevance—are applied before public funds are expended. The Committee, therefore, has taken steps to assure that these advantages of the

154

NIH study section system will be applied to the effort to find a cure for cancer . . .

*Id.* The history also unequivocally indicates that Congress intended the attack on cancer to be undertaken in the "interdisciplinary setting" provided by NIH coordination. *Id.* at 2339. See also *id.* at 2348–49.

■ In view of these strong indications of Congressional intent that cancer research activities be coordinated by NIH and that the existing peer review or study group systems be utilized, plaintiff's contention is seen to be untenable. The procedure employed by NIH, NCI and the NCAB in evaluating grant applications is exactly what Congress hoped for, indeed, mandated, in the National Cancer Act. The court finds no violation of law in the method by which cancer research grant applications in general, and plaintiff's in particular, are processed through NIH, DRG, NCI and NCAB.

■ Tangentially to his attack on the processes from which emanated a decision not to fund his research proposal, plaintiff charges that defendants did not disclose to him as required by law documents, reports and files. He purports to find authority for disclosure in the Freedom of Information Act, 5 U.S.C. § 553. The items withheld from plaintiff and his counsel were: (1) portions of summary statements setting forth the views of peer review groups which considered plaintiff's applications, (2) portions of reports by consultants who visited the site of the proposed research, and (3) priority scores assigned to plaintiff's applications by the groups. A very detailed and well-considered analysis of the requirements of the Freedom of Information Act as it concerns the type of documents or statements at issue here is found in *Washington Research Proj. Inc. v. Dept. of HEW*, 164 U.S.App.D.C. 169, 504 F.2d 238 (1974). For the reasons given there, the court holds that the items listed above were properly withheld from plaintiff's counsel.

B. *Testing of CPDS*

As noted, plaintiff claims that defendants failed adequately to test CPDS, which, he asserts, they are legally required to do if they are to obey their statutory command to exploit every available lead showing promise in the treatment or cure of cancer. The contention basically is that CPDS is an antimetastatic compound, whose beneficial effects are seen only in the retardation or termination of growth or spread of cancer, whereas defendants have tested it only for its toxicity and its anti-tumor effects, which Dr. Grassetti never intimated that it had.

■ Apart from whatever legal duty may lie on defendants to test compounds submitted to them, the court finds that defendants did in fact perform various standard tests, and the treatment accorded plaintiff's chemical compounds was reasonable and non-arbitrary. Tests are conducted by the Division of Cancer Treatment of NCI in the following manner: Tumor cells are injected into two groups of mice. One group is treated with the subject substance (test group), the other group is left untreated (control group). The prime criterion used to assess potential anti-cancer activity is the effect of the substance on mortality. If there is no difference in survival between the test and control groups, or if there is no shrinking of visible tumor masses, the substance is not tested further unless something unique is known about the compound or class of compounds which would lead to further tests.

NCI does not routinely screen substances *specifically* for their anti-metastatic (prevention of cancer spread) activity. This is because, if anti-cancer effects are observed during regular screening, NCI proceeds with drug development regardless of the anti-cancer mechanism involved. In its screening activity, NCI is interested in the net outcome of the test (i. e., survival rate and tumor shrinkage) and not the precise mechanism involved. Thus, the NCI approach

is a "black box" approach; that is, total anti-cancer activity, including one or both of two possible factors, anti-tumor and anti-metastatic effects, is measured, without careful differentiation between the two. Differentiation is not absolutely necessary, since it is the total anti-cancer effect which is the most significant variable.

The Director of the Division of Cancer Treatment, Vincent T. DeVita, M.D., states:

> Although there are tests which could perhaps be utilized to determine specifically the anti-metastatic effects of drugs, in the judgment of NCI scientists these approaches would be no more reliable for predicting the potential utility of anti-cancer drugs than those currently employed to screen for overall anti-cancer activity. In other words, if no anti-cancer activity is observed for a substance tested, as evidenced by the absence of a reduction in mortality or of tumor shrinkage, there is no scientific purpose served by testing for added results of anti-metastatic activity of hundreds of thousands of compounds, most of which will not be shown to inhibit tumor growth in any site. Furthermore, currently there is no *generally* accepted test that directly measures anti-metastatic effects of drugs which does not also show an effect on either the primary lesion (shrinkage) or on metastasis (survival).

Affidavit of Dr. DeVita, Exhibit D of Defendants' Reply to Plaintiff's Opposition.

NCI tests approximately 50,000 compounds each year in the fashion described above. The annual cost of this program is five million dollars. In order to test 50,000 compounds each year specifically for anti-metastatic activity, it would cost much more because the tests are apparently more complex. Defendants state "The NCI staff believes the added cost to be prohibitive and not of high enough priority in view of the questionable value of such testing and other scientific opportunities competing for the same funds."

Under the above procedures, Dr. Grassetti's compounds were tested by NCI. According to the defendants, all were found to be inactive by criteria routinely applied to all compounds regardless of their source. In addition, a special test was performed on CPDS, at the repeated requests of Dr. Grassetti. While "slight activity" was shown, it was defendants' judgment that this activity was not of sufficient magnitude to be considered worth pursuing, under normal criteria.

Defendants' determination of which test to use and of how extensive such testing should be is a matter clearly outside the scope of this court's jurisdiction to review. Likewise, defendants' assessment that a test specifically picking up anti-metastatic activity is cost-prohibitive when weighed against the advantages thereof, is not reviewable here. These are matters for the judgment of medical experts, not courts. At the risk of being pedantic, the court reiterates that which was said before. The only role for this court to play on this issue of testing, like the other issues presented here, is to see that normal procedures were followed and that plaintiff received fair treatment. This he clearly did. If anything, defendants have gone to greater lengths than usual to explore any possible beneficial effects of CPDS and its derivatives. They found none.

For this court to order defendants to perform certain tests on CPDS, or any other compound, would not only be ludicrous, but would also constitute interference of a most egregious sort with an administrative agency trying to do an important job. This the court will not do.

Accordingly, it is the order of this court that defendants' motion for summary judgment be, and hereby is, granted.