The WASHINGTON POST COMPANY, Appellant,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.

No. 80–2572.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1981.

Decided Sept. 24, 1982.

Boisfeuillet Jones, Jr., with whom Carol D. Weisman, Washington, D. C., was on the brief, for appellant.

John C. Martin, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty. at the time the brief was filed, and Royce C. Lamberth, Kenneth M. Raisler, and Michael J. Ryan, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.

Before ROBINSON, Chief Judge, TAMM and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge TAMM.

WALD, Circuit Judge:

This appeal involves a request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, by the Washington Post Company ("Post") for information concerning possible conflicts of interest of scientific consultants employed by the National Cancer Institute (NCI). The Post seeks to compel disclosure, for each consultant, of (1) a list of his non-federal employment and (2) a list of organizations in which the consultant has financial interests related to his consulting duties. The government claims that the information is exempt from disclosure under Exemptions 4 and 6 to FOIA, 5 U.S.C. § 552(b)(4), (6). The district court, on cross-motions for summary judgment, held that the information was not "commercial or financial information" within the meaning of Exemption 4, but that the information could be withheld under Exemption 6 because disclosure would constitute a "clearly unwarranted invasion of personal privacy."

The district court relied heavily on the reasoning of *Association for Women in Science v. Califano,* 566 F.2d 339 (D.C.Cir.1977) (*Women in Science*), where we held that essentially identical information was privileged from discovery under the Federal Rules of Civil Procedure. We conclude, however, that its reliance on *Women in Science* was inappropriate because discovery of information under the Federal Rules and disclosure under FOIA Exemption 6 are independent questions involving different issues. We then perform the balancing of disclosure interests against privacy interests mandated by Exemption 6, and find that the conflict-of-interest information involved in this case is not exempt from disclosure. Finally, we hold that the requested list of consultants' financial interests is "financial" information within the meaning of Exemption 4 and remand for a factual determination of whether release of this information is likely to impair the government's ability to obtain similar information in the future.

## I. BACKGROUND

NCI is a division of the National Institutes of Health (NIH), which is in turn administered by appellee Department of Health and Human Services (HHS).[1] It annually disburses approximately $1 billion in grants and contracts for cancer research. In deciding which grant proposals to fund, NCI depends on the advice of scientific consultants who serve on various advisory boards and committees. These consultants are respected scientists, familiar with can-

---

1. *See* 42 U.S.C. § 281.

cer research, who exercise "peer review" over grant applications.[2]

Pursuant to Executive Order No. 11,222,[3] HHS, in order to monitor conflicts of interest that could affect consultants' judgment of the merits of grant proposals, requires them to complete Form HEW–474. That form, titled "Confidential Statement of Employment and Financial Interests," requires each consultant to list all other federal and non-federal employment and "all organizations in which you, your spouse, minor child, partner, or an organization with which you are connected have financial interests which relate directly or indirectly to your consultancy duties."[4] HHS then reviews this statement to determine whether a conflict exists.[5] Consultants are told that the information on Form 474 will be used to determine whether their consulting duties will involve a conflict of interest, and are given a limited pledge of confidentiality—the information "will not be disclosed except as the Chairman of the Civil Service Commission or the head of the principal operating component or designee may determine for good cause shown."[6]

On February 14, 1980, the Post requested copies of the statements of employment and financial interests filed by members (except *ex officio* members) of NCI's advisory boards and committees. HHS refused the request, relying on FOIA Exemption 6, 5 U.S.C. § 552(b)(6), which exempts from disclosure:

> personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

The Post appealed the decision to the Assistant Secretary of HHS for Public Health and Surgeon General, who affirmed the refusal to disclose. Having exhausted its administrative remedies, the Post filed suit to compel disclosure on July 8, 1980.

After a status call, the district court ordered the parties to file cross-motions for summary judgment. The government, in its motion for summary judgment, again relied on Exemption 6 and added a claim that the requested data was confidential financial information within the meaning of Exemption 4, 5 U.S.C. § 552(b)(4), which permits withholding of:

> trade secrets and commercial or financial information obtained from a person and privileged or confidential.[7]

---

**2.** *See id.* § 286(a). For a more detailed review of NCI procedures, see *Grassetti v. Weinberger,* 408 F.Supp. 142, 147–49 (N.D.Cal.1976).

**3.** 3 C.F.R. 306 (1964–1965 Compilation), *reprinted in* 18 U.S.C. § 201 app. at 1025–27 (1976), *superseded in part by* Ethics in Government Act of 1978, Pub.L.No.95–521, 92 Stat. 1824 (1978) (codified in relevant part at 5 U.S.C. app. §§ 201–405). The provisions of this Executive Order relating to NCI consultants are implemented in 5 C.F.R. §§ 735.-401–.412 (1982) and in 45 C.F.R. §§ 73.735–902 to –1007 (1981).

**4.** Form HEW–474 (rev. 3/77), pt. 2, *reprinted in* Appellant's Appendix ("A.A.") at 21–22. Since this litigation began, this form has been slightly revised. It now refers to the Director of the Office of Personnel Management rather than the Chairman of the Civil Service Commission. Also, it must be completed only by consultants who are not required to file public financial disclosure reports under the Ethics in Government Act of 1978. Form HHS–474 (rev. 1/82), pt. 2.

**5.** Form HEW–474, pt. 4, A.A. at 22.

**6.** *Id.* pt. 2, A.A. at 21, provides in pertinent part:

> "*Information to Appointee*: Completion of this form is required for all experts and consultants who work 130 days or less a year . . . . The information you disclose will be used to determine whether a conflict exists between your employment and financial interests and the performance of your services for the Government. The information will be held in confidence and will not be disclosed except as the Chairman of the Civil Service Commission or the head of the principal operating component or designee may determine for good cause shown."

**7.** In the district court, the government also relied on Exemption 3, 5 U.S.C. § 552(b)(3), which exempts information "specifically exempted from disclosure by statute." However, the government does not appeal from the district court's holding that an Executive Order is not a "statute" within the meaning of Exemption 3. *Washington Post Co. v. United States Dep't of Health & Human Resources,* No. 80–1681, mem. op. at 1 n.2 (D.D.C. Dec. 4, 1980) ("mem. op."), A.A. at 33, 33 n.2.

In support of its motion, the government, which has the burden of justifying nondisclosure, see 5 U.S.C. § 552(a)(4)(B), submitted no evidence except an affidavit by Robert Eaglesome, Director of Personnel Policy for HHS. That affidavit states Mr. Eaglesome's "professional opinion" that disclosure "would impair the Department's ability to obtain candid and accurate information in the future" and might deter "significant numbers of persons" from applying for advisory board or committee positions.[8]

The Post argued with respect to Exemption 6 that the public interest in disclosure of conflicts of interest outweighs the consultants' privacy interests.[9] With respect to Exemption 4, it argued that a mere list of organizations in which one has financial interests, without dollar amounts, is not "financial" information within the meaning of Exemption 4, and that in any event the government had not made a factual showing that disclosure would impair its ability to obtain this information in the future.[10]

The government agreed before decision to release the names of NCI consultants, their federal employment, the results of HHS's review of Form 474, and the name of the reviewing official.[11] Thus, the remaining disputed information was the consultants' non-federal employment and their list of financial interests related to their consulting duties.

The district court held that Exemption 4 did not apply because it was not designed to protect "personal financial information as distinguished from economic data relating to corporations or other business entities."[12] With regard to Exemption 6, the district court felt bound by the reasoning of *Women in Science,* where we held that information contained on Form 474 was privileged from discovery under Rule 26(b)(1) of the Federal Rules of Civil Procedure. In *Women in Science,* for purposes of the confidential report privilege, we balanced the litigants' need for information against the government's need to foster gathering of the information and found the government's need to be greater.[13] The district court recognized that under FOIA Exemption 6, a court must instead balance the public interest in disclosure against the privacy interests of individuals. However, it believed that the general public interest in disclosure was weaker than the specific need of the plaintiffs in *Women in Science,*[14] and that the consultants' personal privacy interests were "identical for purposes of practical analysis" to the government's interest in gathering information.[15] Therefore, the district court found the balance struck in *Women in Science* to be controlling for Exemption 6 purposes, and held that Form 474 was exempt from disclosure.

In this appeal, the Post argues that *Women in Science* is not controlling and that the balancing of interests required by Exemption 6 mandates disclosure. The government contests that proposition and also argues that the disputed information is both "financial" and "confidential," and hence is covered by Exemption 4.

**8.** Affidavit of Robert Eaglesome ¶ 7 (Oct. 3, 1980), A.A. at 24, 26.

**9.** Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at 6–9, A.A. at 11, 16–19. The Post also argued that Form 474 does not contain the type of intimate personal material that constitutes "similar" files under Exemption 6. The narrow interpretation of "similar" files on which the Post relied was rejected in the recent Supreme Court decision in *United States Dep't of State v. Washington Post Co.,* 456 U.S. ——, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982). *See* note 22 *infra* and accompanying text.

**10.** Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and Supporting Memorandum at 6–8.

**11.** Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment at 6–7.

**12.** Mem. op. at 2 n.2, A.A. at 34 n.2.

**13.** *See* 566 F.2d at 346.

**14.** Mem. op. at 4, A.A. at 36.

**15.** *Id.* at 4 n.9, A.A. at 36 n.9.

## II. EXEMPTION 6

### A. The Limited Relevance of Discovery Rules for Exemption 6

■ It is well established that information that is exempt from disclosure to the general public under FOIA may nevertheless be subject to discovery.[16] This case involves the converse question: whether information that is privileged against discovery can nonetheless be obtained under FOIA.

As an initial matter, neither the text nor the legislative history of FOIA suggests that the existence of a discovery privilege should control the determination of whether withholding is warranted under Exemption 6. Exemption 6 does not refer explicitly to evidentiary privileges. In contrast, Exemption 4 exempts "commercial or financial information obtained from a party and *privileged* or confidential." 5 U.S.C. § 552(b)(4) (emphasis added). Similarly, Exemption 5 permits withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." *Id.* § 552(b)(5). That Congress expressly included evidentiary privileges in Exemptions 4 and 5 but not in Exemption 6 suggests that it did not intend privilege doctrine to control withholding of information under Exemption 6.

Moreover, even though Exemption 5 directly implicates discovery doctrine, the Supreme Court has stated that "discovery rules can only be applied under Exemption 5 by way of rough analogies." *EPA v. Mink,* 410 U.S. 73, 86, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973). In part, this is because FOIA does not "permit inquiry into particularized needs of the individual seeking the information, although such an inquiry would ordinarily be made of a private litigant." *Id.* And this court recently rejected a claim that an intra-agency report which is privileged from discovery is therefore exempt from disclosure:

> The short answer to the [government's] contention is that the issues in discovery proceedings and the issues in the context of a FOIA action are quite different. That for one reason or another a document may be exempt from discovery does not mean that it will be exempt from a demand under FOIA.

*Playboy Enterprises v. Department of Justice,* 677 F.2d 931, 936 (D.C.Cir.1982); *see Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 862 (D.C.Cir.1980).

Exemption 6, then, requires an independent inquiry into whether withholding is proper. *Accord Moore-McCormack Lines v. I. T. O. Corp.,* 508 F.2d 945 (4th Cir. 1974); *cf. Baldrige v. Shapiro,* 455 U.S. ——, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982) (treating the availability of FOIA Exemption 3 and the existence of a discovery privilege as separate issues). We must still consider, however, how closely analogous the reasoning in *Women in Science* regarding the confidential report privilege is to the reasoning required to find a "clearly unwarranted invasion of personal privacy" under Exemption 6.

Although both Exemption 6 and the confidential report privilege involve balancing, there the similarity stops. Under Exemption 6, we must balance the interest of the general public in disclosure against the privacy rights of individuals. Under the confidential report privilege, we must balance the individual litigant's need for information against the government's need to obtain the information in the future.

Considering first the interests in disclosure, the particular need of the requester is irrelevant under FOIA,[17] but critical in dis-

---

**16.** *See Baldrige v. Shapiro,* 455 U.S. 345, 360 n. 15, 102 S.Ct. 1103, 1112 n. 15, 71 L.Ed.2d 199 (1982); *Women in Science,* 566 F.2d at 342–43; Toran, *Information Disclosure in Civil Actions: The Freedom of Information Act and the Federal Discovery Rules,* 49 Geo.Wash.L.Rev. 843, 848–54 (1981).

**17.** *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 143 n.10, 95 S.Ct. 1504, 1513 n.10, 44 L.Ed.2d 29 (1975) ("Sears' rights under [FOIA] are neither increased nor decreased by reason of the fact that it claims an interest . . . greater than that shared by the average member of the public."); *EPA v. Mink,* 410 U.S. 73, 86, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973) (FOIA

covery actions.[18] A related issue in discovery actions which has no counterpart under FOIA is the relevance of the information to the pending litigation. Conversely, the general public interest in certain information, a key factor under FOIA, is irrelevant in discovery.

Furthermore, in FOIA cases "the presumption in favor of disclosure is at its zenith." *Grolier, Inc. v. FTC,* 671 F.2d 553, 556 (D.C.Cir.1982) (per curiam) (Exemption 5), *cert. granted,* 51 U.S.L.W. 3353 (U.S. Nov. 9, 1982). Thus, even if Exemption 6 and the confidential report privilege involved the same interests, the balancing of those interests might come out differently under Exemption 6.

As for the interests supporting nondisclosure, factors that are relevant in discovery actions can be irrelevant under FOIA and vice-versa. A critical factor in our decision in *Women in Science* was our belief that disclosure might impair the government's ability to acquire similar information in the future. *See* 566 F.2d at 346. That factor carries no weight under Exemption 6, which focuses on individual privacy interests. Conversely, the privacy interests of persons who provide information to the government do not directly affect the government's confidential report privilege but are central to an Exemption 6 analysis. Furthermore, the availability of information from other sources weakens the case for discovery but, if anything, strengthens the case for FOIA disclosure by suggesting that disclosure will not seriously invade personal privacy.[19]

In short, privilege against discovery and exemption under Exemption 6 are separate issues and require separate analysis. It may at first blush seem incongruous that information which plaintiffs in *Women in Science* could not obtain in 1977 despite specific need for it can now be disclosed to the general public under FOIA. However, even putting aside the effects of intervening legislation—notably the Ethics in Government Act of 1978, discussed below—on the rationale of *Women in Science,* any incongruity is a product of congressional intent as reflected in different statutes with different tests for disclosure. Perhaps the plaintiffs in *Women in Science* should have pursued the information they desired under FOIA,[20] but their failure to do so does not alter the FOIA rights of the Post. We therefore proceed to analyze Exemption 6 independently of our decision in *Women in Science.*[21]

18. *See, e.g., EPA v. Mink,* 410 U.S. at 86, 93 S.Ct. at 835; *Women in Science,* 566 F.2d at 346; Toran, *supra* note 16, at 854.

19. *See United States Dep't of State v. Washington Post Co.,* 456 U.S. ——, —— n.5, 102 S.Ct. 1957, 1962 n.5, 72 L.Ed.2d 358 (1982) ("public nature of information may be a reason to conclude . . . that the release of such information would not constitute a 'clearly unwarranted invasion of personal privacy'").

20. In *Women in Science,* we emphasized that plaintiffs sought disclosure of the information reported in Form 474 only through discovery and "*not* through an FOIA request." 566 F.2d at 342 (emphasis in original).

21. The dissent is concerned that our holding will encourage litigants to use FOIA as a substitute for discovery. *Post* at 280. We expect, to the contrary, that information available under FOIA will almost always be available through discovery as well. *See* Toran, *supra* note 16, at 855 ("As a general rule, the discovery scheme provided by the [Federal] Rules is generous and needs no augmentation by the

does not "permit inquiry into particularized needs of the individual seeking the information").

*Sears* and *Mink* were Exemption 5 cases; thus their strong language is technically dictum for Exemption 6. And in fact our early Exemption 6 cases contemplated inquiry—"unique for exemption 6"—into the specific need of the person requesting the information. *Rural Housing Alliance v. United States Dep't of Agriculture,* 498 F.2d 73, 77 (D.C.Cir.1974); *see Getman v. NLRB,* 450 F.2d 670, 677 n.24 (D.C. Cir.1971). More recently, however, we questioned whether a special rule for Exemption 6 was consistent with FOIA's broad purpose to enable "any person" to obtain information. *Ditlow v. Shultz,* 517 F.2d 166, 171 n.21 (D.C. Cir.1975). Until advised otherwise by the Supreme Court, we think it appropriate to accept *Sears* and *Mink* at face value, and thus not to inquire into the particular need of the requester. *Accord Kurzon v. Department of Health & Human Servs.,* 649 F.2d 65, 68 (1st Cir. 1981). *See generally* Kronman, *The Privacy Exemption to the Freedom of Information Act,* 9 J. Legal Stud. 727, 743 n.60 (1980).

B. *The Exemption 6 Balancing of Interests*

Exemption 6 permits withholding of "personnel and medical files and similar files" whose disclosure would be "a clearly unwarranted invasion of personal privacy." The analysis proceeds in two stages. First, we must determine whether the information on Form 474 is contained in personnel, medical, or "similar" files. If so, we must determine whether disclosure would constitute "a clearly unwarranted invasion of personal privacy."

■ The first stage is fairly minimal and is easily satisfied in this case. All information which "applies to a particular individual" is covered by Exemption 6, regardless of the type of file in which it is contained. *United States Department of State v. Washington Post Co.*, 456 U.S. ——, ——, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982). This ensures that FOIA's protection of personal privacy is not affected by the happenstance of the type of agency record in which personal information is stored. *Id.* at ——, 102 S.Ct. at 1961. Each Form 474 is filled out by a particular consultant and thus meets the threshold criterion for coverage under Exemption 6.[22]

■ In the second stage—determining whether disclosure is clearly unwarranted—

we must balance the public interest in disclosure against the privacy interests of the consultants. *Department of the Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976). In performing this balance, we must keep in mind Congress's "dominant objective" to provide full disclosure of agency records. *Id.* at 361, 96 S.Ct. at 1599; *see Baldrige v. Shapiro*, 455 U.S. 345, 352, 102 S.Ct. 1103, 1108, 71 L.Ed.2d 199 (1982); S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965) ("S.Rep."). Congress, however, also created nine "carefully structured" exemptions to FOIA "to protect specific confidentiality and privacy interests. But unless the requested material falls within one of these nine statutory exemptions, FOIA requires that ... [it] be made available on demand to any member of the general public." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 220–21, 98 S.Ct. 2311, 2316, 57 L.Ed.2d 159 (1978) (footnote omitted). Moreover, these exemptions are to be "narrowly construed." *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599; *see Washington Post Co. v. United States Department of State*, 685 F.2d 698, 700 (D.C. Cir.1982); S.Rep. at 3 (FOIA establishes a "general philosophy of full disclosure unless information is exempted under *clearly delineated* statutory language") (emphasis added).[23]

FOIA."). If abuse of FOIA is or becomes a problem, the appropriate recourse is an amendment to FOIA. Indeed, the Justice Department, recognizing that "[u]nder present law there is no statutory prohibition to the use of FOIA as a discovery tool," recently proposed an amendment to prohibit litigants from using FOIA as a discovery device. U. S. Department of Justice, Office of Information Law and Policy, *FOIA Update* 10 (Dec. 1981).

22. Prior to being reversed in *United States Department of State v. Washington Post*, this court had construed "similar" files under Exemption 6 to apply only to agency records that contained information as highly personal or intimate in nature as that contained in personnel or medical records. *E.g., Washington Post Co. v. United States Dep't of State*, 647 F.2d 197, 198–99 (D.C.Cir.1981), *rev'd*, 456 U.S. ————, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982); *Simpson v. Vance*, 648 F.2d 10, 13 (D.C.Cir. 1980); *Board of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392 (D.C.Cir.1980).

23. The dissent incorporates into its balancing a broad-ranging inquiry into, among other things, the "public harm that might result from disclosure," principally the risk that disclosure might deter qualified scientists from becoming consultants or might lead consultants not to fully disclose their financial interests. *Post* at 280–82. The government's need to obtain conflict of interest information is, as we discuss below, relevant to an Exemption 4 claim. But Exemption 6 on its face is concerned with protecting personal privacy, and no more. Moreover, it would be alien both to the disclosure mandate of FOIA and to Congress' careful and narrow drafting of the nine exemptions to engage in such a broad inquiry. *See Board of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 400 (D.C.Cir.1980) (Commission's concern that disclosure to the Board of Trade of the names of trade sources who had supplied information about the Board to the Commission would reduce its oversight ability is "not germane" to Exemption 6); *Robles v. EPA*, 484 F.2d 843, 847 (4th Cir. 1973) (refusing to con-

■ In addition to Congress's general purpose to make disclosure the dominant practice and withholding the exception, Exemption 6's requirement that disclosure be "clearly unwarranted" instructs us to "tilt the balance [of disclosure interests against privacy interests] in favor of disclosure." *Ditlow v. Shultz,* 517 F.2d 166, 169 (D.C.Cir. 1975); *Getman v. NLRB,* 450 F.2d 670, 674 (D.C.Cir.1971). As the Supreme Court stressed in *Rose,* 425 U.S. at 378 n.16, 96 S.Ct. at 1607 n.16, Congress's choice of the "clearly unwarranted" standard was a "considered and significant determination," made despite repeated objections by government witnesses to the heavy burden it creates. Thus, under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act.

### 1. Privacy Interests

Turning to Form 474, we first consider whether disclosure would create an invasion of privacy at all and, if so, how serious an invasion. *Rural Housing Alliance v. United States Department of Agriculture,* 498 F.2d 73, 77 (D.C.Cir.1974).[24] We then evaluate the public interest in disclosure. Finally, we balance the competing interests to determine whether the invasion of privacy is clearly unwarranted.

The disputed portions of Form 474 require consultants to list their non-federal employment and any organizations in which the consultant, his spouse, minor children, partners, or organizations with which he is connected have financial interests that relate to his consulting duties. Notably, Form 474 requests only cursory information. For employment, consultants need only list their employer, the "kind of organization (e.g., Manufacturing, research, insurance)" it is, and the title or kind of position they hold.[25] For financial interests, they need only list the name and kind of organization, the nature of the interest, and in whose name it is held.[26] Form 474 does not require information on either rates of pay or the dollar amount of financial interests.

Considering the employment information first, we believe that disclosure would be only a minimal invasion of privacy. As the Supreme Court recently noted, "employment history ... is not normally regarded as highly personal." *United States Department of State v. Washington Post,* 456 U.S. at ——, 102 S.Ct. at 1960; *see Board of Trade v. Commodity Futures Trading Commission,* 627 F.2d 392, 399 (D.C.Cir.1980) (occupations of sources of information "may [raise] some slight privacy interest"). In addition, although its brief discusses the privacy interest in Form 474's financial information, the government does not even attempt to explain why the information on consultants' non-federal employment raises privacy concerns.[27] Indeed, the government admits that the employment of most of NCI's consultants is available from the biographical sketches in *American Men and Women of Sciences,* a widely available publication.[28] This omission is especially telling in light of the government's burden to justify nondisclosure.

The government also fails to demonstrate a substantial privacy interest in the limited

---

sider the argument that disclosure "would do more harm than good"). The legislative history supports limiting Exemption 6 to privacy interests. *See* H.R.Rep.No.1497, 89th Cong., 2d Sess. 11 (1966), reprinted in 1966 U.S.Code Cong. & Ad.News, 2418, 2428 ("H.R.Rep.") (the Exemption "provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information"); S.Rep. at 9 (similar).

**24.** *Accord Church of Scientology v. United States Department of the Army,* 611 F.2d 738, 746 (9th Cir. 1979); *Committee on Masonic Homes v. NLRB,* 556 F.2d 214, 220 (3d Cir. 1977).

**25.** Form HEW–474 (rev. 3/77), pt. II, A.A. at 21.

**26.** *Id.,* A.A. at 22.

**27.** *See* Government's Brief at 8–9. The government was also silent on this point in the district court. *See* Memorandum in Support of Defendants' Motion for Summary Judgment at 3.

**28.** Memorandum in Support of Defendants' Motion for Summary Judgment at 6.

financial information contained in Form 474. The government asserts that Form 474 contains "intimate details" of personal finances, but does not explain why it reaches that conclusion.[29] The cases it cites recognize in dictum that personal financial information "*may*" implicate privacy concerns "*insofar* as it contains 'embarrassing disclosures' or involves 'sufficiently intimate details.'" *National Parks & Conservation Association v. Kleppe,* 547 F.2d 673, 685 (D.C. Cir.1976) (*National Parks II*) (emphasis added); *see Simpson v. Vance,* 648 F.2d 10, 14 (D.C.Cir.1980). But even those cases do not say that embarrassing personal financial information *is* exempt under Exemption 6, only that such information is sufficiently private so that it must be balanced against disclosure interests to determine if the invasion of privacy is clearly unwarranted.[30] And they lend us no aid whatsoever as to why Form 474's list of concerns in which consultants have financial interests is embarrassing or highly private information.

We conclude that release of the list in Form 474 of organizations in which consultants have financial interests, while constituting a greater invasion of privacy than release of the list of their non-federal employment, still does not amount to a serious invasion. It merits emphasis that consultants not only need not disclose dollar amounts, but must disclose only financial interests that relate to their consulting duties. While public knowledge of affiliation with some organizations may, in some circumstances, lead to embarrassment or harm,[31] we perceive little such danger from disclosure of affiliations related to one's scientific consulting.

Several pieces of evidence support this view. First, in response to a questionnaire mailed to NIH consultants by the plaintiffs in *Women in Science,* only 10% of respondents (7/69) stated that they would object to serving or having served on an advisory committee if a "complete list of your professional affiliations and financial holdings such as you provided to NIH" were made public.[32] Presumably even fewer would have objected if the questionnaire had not referred to a "complete list of . . . financial holdings," thus suggesting that all financial interests, including dollar amounts, would be made public. This response strongly suggests that most scientific consultants do not regard the information contained in Form 474 as highly personal.[33]

Second, Executive Order 11,222 does not require that consultants' statements be held confidential—it at most *permits* the government to promise confidentiality.[34] The de-

---

**29.** Government's Brief at 8–9.

**30.** *National Parks II* and *Simpson* were decided under the prior rule in this circuit requiring a substantial showing to meet the threshold Exemption 6 requirement of "similar" files. *See* note 22 *supra.*

No cases, to our knowledge, have held that a list of financial interests *without* dollar amounts is exempt under Exemption 6. The government cites two district court cases in other circuits which merely held that information on dollar amounts should be disclosed with identifying names deleted. *Florida Medical Ass'n v. Department of Health, Educ. & Welfare,* 479 F.Supp. 1291, 1305 (M.D.Fla.1979) (Medicare reimbursements to physicians); *Sonderegger v. United States Dep't of the Interior,* 424 F.Supp. 847, 856 (D.Idaho 1976) (claims for federal disaster relief). We intimate no view on whether these decisions are correct.

**31.** *Cf. NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (NAACP membership lists protected from state-ordered disclosure by first amendment).

**32.** Joint Appendix at 70–145, *Women in Science.* The plaintiffs received 76 responses to their questionnaire. Sixty-two people replied "no," 7 replied "yes," 4 responded with some variant of "maybe," and 3 did not respond.

**33.** The dissent argues that this conclusion ignores the interests of the minority who would object. *Post* at 277. It is intrinsic to a balancing analysis, however, that the views of the majority who do not object receive greater weight than the views of the more sensitive minority. *Cf. United States Dep't of State v. Washington Post,* 456 U.S. at ——, 102 S.Ct. at 1960 (emphasis added) (noting that "place of birth, date of birth, date of marriage, employment history, and comparable data is not *normally regarded* as highly personal").

**34.** It is a close question whether Exec. Order No. 11,222 in fact authorizes a pledge of confi-

cision not to require a promise of confidentiality was apparently deliberate, for the Order does require that the more extensive disclosure statements of certain high-level officials be kept confidential.[35] This suggests that the President did not view the limited disclosure required of consultants to be a serious invasion of privacy. Moreover, as we discuss below, most of the confidentiality provisions of the Order were repealed by the Ethics in Government Act of 1978—suggesting Congress' view that financial disclosure is not an undue invasion of privacy.

Third, the consultants are given only a limited promise of confidentiality—the information can be disclosed "for good cause." That vague phrase could mean, for all the consultants know, that conflicts of interest will generally be made public. Yet the government has not suggested that this undefined and potentially broad exception to confidentiality has discouraged scientists from accepting consulting positions.

■ To be sure, the consultants' expectations of privacy were heightened by the government's pledge of confidentiality. Other things being equal, release of information provided under a pledge of confidentiality involves a greater invasion of privacy than release of information provided without such a pledge. On the other hand, to allow the government to make documents exempt by the simple means of promising confidentiality would subvert FOIA's disclosure mandate. On balance, we believe that a government pledge of confidentiality, made in good faith and consistently honored, should generally be given weight on the privacy side of the scale in accord with its effect on expectations of privacy. *Cf. Ditlow v. Shultz,* 517 F.2d 166, 172 (D.C.Cir.1975) (footnote omitted) ("the absence of a governmental assurance of confidentiality . . . would seem to undercut the privacy expectations protected by exemption 6"). However, such a pledge should not be given determinative weight where the public interest in disclosure is high and the privacy interest in the information would otherwise be low. *See Ackerly v. Ley,* 420 F.2d 1336, 1340 n.3 (D.C.Cir. 1969) ("pledge of confidentiality . . . can not, in and of [itself], override the Act"); *Robles v. EPA,* 484 F.2d 843, 846 (4th Cir. 1973) (similar).[36] In this case, we believe

dentiality to consultants. Part III of the Order regulates "special Government employees," including part-time consultants and advisers; in particular, § 306 instructs each *agency* to require special government employees to disclose "other employment" and "such . . . financial information as the appointing department or agency shall decide is relevant." Part III does not mention confidentiality. Part IV, § 401(a) requires certain high-level officials to submit a detailed report of financial interests; § 402 also permits the *Civil Service Commission* to prescribe regulations for "submission of statements of financial interests by such employees . . . as the Commission may designate." Under § 405 of Part IV, financial statements "required by or pursuant to *this part* shall be held in confidence" and disclosed only for good cause. (Emphasis added.)

Thus, Part III of the Executive Order seems to contemplate limited disclosure by all "special Government employees" to individual agencies, *without* a promise of confidentiality; while Part IV contemplates more extensive disclosure by high-level regular employees to the Civil Service Commission, *with* a promise of confidentiality. It may be that consultants, advisers, and other special government employees come within the Civil Service Commission's

authority under § 402 of Part IV to require disclosure from "such employees . . . as the Commission may designate." We so held in *Women in Science,* although we were "concern[ed] about the length to which one must go to reach this conclusion." 566 F.2d at 345. But while the Order may permit a pledge of confidentiality, it certainly does not require such a pledge.

**35.** Exec. Order No. 11,222, §§ 401(a), 405, 3 C.F.R. 306, 308–09 (1964–1965 Compilation), *reprinted in* 18 U.S.C. § 201 app. at 1026, *superseded in part by* Ethics in Government Act of 1978, Pub.L.No.95–521, 92 Stat. 1824 (1978) (codified in relevant part at 5 U.S.C. app. §§ 201–405).

**36.** In a case where a past pledge of confidentiality tips the balance in favor of withholding and similar information is to be collected in the future, it may be appropriate for a court to warn the government and the public that in the future, such promises of confidentiality will not determine the outcome of a FOIA suit. This would protect the legitimate privacy expectations of persons who had relied on the government's pledge while still requiring disclosure in the future. Of course, we need not decide in

that the limited pledge of confidentiality does not substantially increase the privacy expectations of most consultants; certainly not enough to tip the balance in favor of withholding.

### 2. Disclosure Interests

In contrast to the limited privacy interests, the public has a singularly strong interest in disclosure of consultants' conflicts of interest. Scientific consultants determine, in large part, who receives roughly $1 billion per year in cancer research funds. While the peer review system provides the government with needed expert advice, it also has undeniable potential for occasional abuse. Unscrupulous consultants could promote the projects of organizations with which they are connected, recommend disapproval of the projects of competitors, or, to curry favor for their own proposals, recommend projects favored by other consultants.

The possibility of such conflicts is more than mere speculation. HHS's program of in-house review is itself evidence that conflicts of interest are a potential problem. Also, there have been recent allegations of and investigations into conflicts of interest on the part of NCI peer reviewers. *See National Cancer Institute Contract and Procurement Procedures, 1981: Hearing Before the Senate Comm. on Labor and Human Resources,* 97th Cong., 1st Sess. (June 2, 1981) (*"NCI Hearing"*). For example, a 1978 investigation by HEW (the

predecessor agency to HHS) into the relationship between NCI and a particular contract grantee, while it found no violation of federal conflict-of-interest standards, noted the "close relationship" between NCI officials and the grantee, and expressed concern that NCI consultants "serve in several roles which ... are difficult to compartmentalize ... [and which] create an appearance of a conflict which could affect scientific judgment." [37] In the view of then HEW Secretary Joseph Califano, the report raised "serious questions concerning the role of consultants ... who perform services both for the Department and for private entities in related areas." [38]

 One hopes, of course, that HHS's in-house review is rigorous enough to catch any abuses. But the purpose of FOIA is to permit the public to decide *for itself* whether government action is proper. Congress was all too aware of the "[i]nnumerable times" that agencies had withheld information under prior law "only to cover up embarrassing mistakes or irregularities." S.Rep. at 3. FOIA was designed to prevent such incidents and establish instead "[t]he right of the individual to be able to find out how his government is operating." H.R. Rep., *supra* note 23, at 6, 1966 U.S.Code Cong. & Ad. News at 2423.[39] In light of that purpose, the public interest in disclosure is not diminished by the possibility or even the probability that HHS is doing its reviewing job right.[40]

---

this case when, if ever, such a warning would be appropriate.

**37.** Report by Thomas Norris, Inspector General, HEW, at 9 (July 18, 1978), *reprinted in NCI Hearing* at 158, 166.

**38.** Memorandum from Joseph Califano, Secretary of HEW, to Dr. Julius Richmond, Assistant Secretary for Health, at 1 (Sept. 11, 1978), reprinted in *NCI Hearing* at 151, 151. *See also NCI Hearing* at 167–68 (discussing another investigation which found a conflict of interest; *NIH Research Grants: Hill Flies Blind,* Wash. Post, Apr. 13, 1980, at A–2 (noting charges that "reviewers favor friends and acquaintances"); *cf. EPA Chief Violated Contract Award Rules, Probe Finds,* Wash. Post, Apr. 10, 1982, at A–3 (allegation that EPA allowed a grantee to select his own peer reviewers).

**39.** *See also, e.g., NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978) ("The basic purpose of FOIA is to ensure an informed citizenry ... needed to check against corruption and to hold the governors accountable to the governed."); *Department of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976) (noting "congressional objective ... to open agency action to the light of public scrutiny"); Kronman, *supra* note 17, at 733–34 (noting that one principal purpose of FOIA is to monitor official conduct).

**40.** The *NCI Hearing* also raised questions about the rigorousness of in-house review. *See, e.g.,* Memorandum from Dr. Vincent DeVito, Jr., Director of NCI, to Director of NIH, at 1 (June 12, 1980), *reprinted in NCI Hearing* at 193, 193

Our belief that public disclosure of conflict-of-interest information is vital is strengthened by Congress' passage of the Ethics in Government Act of 1978.[41] This Act requires all government employees at pay grade GS–16 or above to file a highly detailed financial statement, which is available to the public.[42] Most NCI consultants, although paid a daily rate equal to GS–18,[43] are presumably not covered by the Act because it does not apply to employees who work 60 days or less a year.[44] Nevertheless, the Act shows Congress' general belief that public disclosure of conflicts of interest is desirable despite its cost in loss of personal privacy.[45] Indeed, it is hard to see how disclosure of the limited information on Form 474 can be a clearly unwarranted invasion of privacy for a consultant who

works just short of 60 days in a year, while regular employees with comparable or in some cases lesser responsibility must make far more extensive disclosure under the Ethics in Government Act.[46]

In sum, when the strong interest in disclosure of potential abuses of official position is balanced against the consultants' relatively slight privacy interest in the limited information required by Form 474, we have no trouble concluding that disclosure is not "clearly unwarranted."

### III. EXEMPTION 4

Exemption 4 authorizes withholding of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552

---

(requesting "[a] more flexible interpretation [of the conflict of interest regulations] generally and/or a waiver for the specific case in question").

**41.** Pub.L.No.95–521, 92 Stat. 1824 (1978) (codified in relevant part at 5 U.S.C. app. §§ 201–405).

**42.** *See* 5 U.S.C. app. §§ 201 (persons required to disclose), 202 (information to be disclosed), 205 (public access to reports).

**43.** *See* 42 U.S.C. §§ 286b(a)(8) (setting compensation for members of the National Cancer Advisory Board); 286c(a)(2)(C) (same for President's Cancer Panel).

**44.** 5 U.S.C. app. § 201(h). The record does not disclose whether any consultants work more than 60 days a year. Any who do would appear to be covered by the Ethics in Government Act, subject to the provisions in § 201(i) for waiver of the reporting requirement in individual cases. For consultants who are covered, there can be no warrant for not disclosing the much more limited information contained in Form 474, either under Exemption 6 (because Congress has performed the balancing of disclosure interests and privacy interests and opted for disclosure) or under Exemption 4 (because the information on Form 474 can no longer be considered "confidential"). *Cf. Carson v. United States Dep't of Justice,* 631 F.2d 1008, 1017 n.30 (D.C.Cir.1980) ("[T]he extent to which prior agency disclosure may constitute a waiver of the FOIA exemptions must depend both on the circumstances of prior disclosure and on the particular exemptions claimed.").

**45.** *See* S.Rep.No.170, 95th Cong., 1st Sess. 165 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 4216, 4376 ("the Committee carefully balanced the privacy interests of the reporting individual and his immediate family with the legitimate public interest in full disclosure").

**46.** One could argue that because Congress, in enacting the Ethics in Government Act, was aware of the existing disclosure requirements in Exec. Order No. 11,222 for consultants and other special government employees, *see* S.Rep.No.170, *supra* note 45, at 27, 1978 U.S. Code Cong. & Ad.News at 4243, and chose not to require public disclosure, it viewed such disclosure as unwarranted. But there is little support in the legislative history for this view. The House and Senate reports do not explain why employees who work 60 days or less a year are excluded. The rule may have been adopted for administrative convenience. An earlier House version gave the Director of the Office of Government Ethics discretion to exclude persons "whose employment is temporary or intermittent." H.R.6954, sec. 101(a), § 7362(b)(1) (1977), *reprinted in* H.R.Rep.No. 642 (Pt. I), 95th Cong., 1st Sess. 3 (1977).

It does not appear, nor would it be plausible, that Congress made a conscious policy choice that complete public disclosure is desirable for employees who work more than 60 days per year, but no public disclosure is desirable for employees who work 60 days or less, regardless of the employees' control over public funds or the likelihood that their work will involve conflicts of interest. Thus, we give greater weight to the Act's primary purpose to require public disclosure of conflicts of interest than to the narrow and unexplained exception for employees who work 60 days or less per year.

(b)(4). Thus, there are two threshold requirements for Exemption 4: the information must be (1) "obtained from a person" and (2) "commercial or financial."[47] If these threshold requirements are met, we must determine whether the information is "privileged or confidential."

### A. Applicability of Exemption 4 to Personal Financial Information

 We do not see, nor has the government explained, how the list of non-federal employment on Form 474 can be "commercial or financial information." As for the list of financial interests, it was certainly "obtained from a person," but the parties dispute whether it is "financial" information within the meaning of Exemption 4. The district court held that it was not because the Exemption "does not cover personal financial information as distinguished from economic data relating to corporations or other business entities."[48] We disagree.

The statutory language is not, on its face, restricted to commercial as opposed to personal financial information. The reference to trade secrets and commercial information suggests that business information was Congress's primary concern. On the other hand, to limit "financial information" to "commercial financial information" would all but read "*and* financial" out of the statute. On balance, we believe that the plain language of Exemption 4 covers all financial information, despite the apparent commercial focus of the Exemption.

The legislative history also suggests that Exemption 4 covers personal financial information. The House and Senate reports are silent on the meaning of "commercial or financial"; apparently because they refer to an earlier version of the statute that covered *all* privileged or confidential information. *See Davis, The Information Act: A Preliminary Analysis*, 34 U.Chi.L.Rev. 761, 789–90 (1967); *Board of Trade*, 627 F.2d at 403 nn.76–77. But the Senate, at least, expressly contemplated that personal information would be covered by Exemp-

tion 4. The Senate Judiciary Committee altered an earlier draft covering information "obtained from the public" to read "obtained from any person," and explained the change as follows:

> It was pointed out in statements to the committee that agencies may obtain information of a *highly personal and individual nature.* To better convey this idea the substitute language is provided.

S.Rep. at 2 (emphasis added).

Our cases are in accord. In *Rural Housing Alliance v. United States Department of Agriculture*, 498 F.2d 73, 78 (D.C.Cir. 1974), we held:

> While it is true that exemption 4 is primarily a trade secrets exemption, it also protects individuals from disclosure of financial information which is privileged or confidential.

Subsequent Exemption 4 cases have not undercut this holding. The district court relied on *National Parks II*, 547 F.2d at 685, where we questioned in dictum whether "personal privacy rights [are] a relevant concern under the fourth exemption." But in that case, all parties agreed that the information was "financial." *Id.* at 677. At issue was whether personal privacy rights were a factor in deciding whether the admittedly financial information was *also* "confidential." Thus, the district court's reliance on *National Parks II* was misplaced.

 It remains to consider whether a list of organizations in which one has financial interests, without dollar amounts, is "financial" information. Lacking guidance in the legislative history, we must give the term "financial" its "ordinary meaning[ ]." *Board of Trade*, 627 F.2d at 403 (footnote omitted). In our view, the list of organizations required by Form 474 is within the common understanding of the term "financial." Indeed, we cannot think of any description of that information that would not use the word "financial" or a synonym.

---

47. We are not concerned here with Exemption 4's protection of "trade secrets."

48. Mem. op. at 2 n.2, A.A. at 34 n.2 (citations omitted).

## B. The Meaning of "Confidential" Under Exemption 4

The remaining issue is whether the list of financial interests is "privileged or confidential." The government has not asserted that Form 474 is "privileged" within the meaning of Exemption 4.[49] We are puzzled as to why not, given the government's general reliance on *Women in Science,* where we held that Form 474 was protected from discovery by the confidential report privilege. Be that as it may, we need only decide whether the list of financial interests is "confidential."

### 1. The Limited Relevance of Discovery Rules

As with Exemption 6, we must first consider the relevance of our decision in *Women in Science* finding Form 474 to be privileged against discovery. Our analysis in Part II.A of the relevance of discovery rules to Exemption 6 applies in large part to the confidentiality aspect of Exemption 4 as well.

■■■ Once again, the existence of a discovery privilege does not preclude the courts from making an independent decision on whether withholding is permitted by FOIA. Rather, the question is whether the reasoning of *Women in Science* is so closely analogous to Exemption 4 reasoning as to be controlling as a practical matter. The answer is certainly no. First, the confidential report privilege at issue in *Women in Science* required a balancing of litigants' need for information against government interests served by confidentiality. In contrast, Exemption 4 contemplates an objective, largely *non*-balancing analysis of whether information is confidential. Also, to the extent that Exemption 4 requires balancing, the interests favoring disclosure—as under Exemption 6—are different for discovery and FOIA. In this case, because of the particular privilege involved in *Women in Science,* the interests favoring nondisclosure admittedly overlap to a degree. However, this need not be true for other privileges, and even in this case, the partial overlap does not make *Women in Science* controlling.

We also caution, in case the issue is raised on remand, against an automatic assumption that because Form 474 was held to be privileged under Rule 26(b)(1), it is also privileged under Exemption 4. Neither this nor any other circuit, to our knowledge, has considered the meaning of "privileged" under Exemption 4.[50] But under Exemption 5, which also refers explicitly to evidentiary privileges, the Supreme Court has stated that "the discovery rules can only be applied ... by way of rough analogies." *EPA v. Mink,* 410 U.S. at 86, 93 S.Ct. at 835. Moreover, in *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 354, 99 S.Ct. 2800, 2809, 61 L.Ed.2d 587 (1979), the Court questioned whether "Exemption 5 was intended to incorporate every privilege known to civil discovery." It proceeded to

---

**49.** Government's Brief at 13 n. 10; *see id.* at 15 (relying on *Women in Science* only for the factual proposition that disclosure "would impair the ability of the government to obtain the information contained in the forms in the future").

**50.** A sentence in *Gulf & W. Indus. v. United States,* 615 F.2d 527, 530 (D.C.Cir.1979) ("Information is privileged or confidential if it is not the type usually released to the public and ... if released ... would cause substantial [competitive] harm ...."), suggests that the test for privileged and confidential information is the same. But *Gulf & Western* contains no discussion of "privilege," apparently does not involve privileged material, and relies on *National Parks & Conservation Ass'n v. Morton,* 498 F.2d 765 (D.C.Cir.1974) *("National Parks I"),* where we expressly noted that no claim of privilege was involved. 498 F.2d at 766. In light of the explicit reference in the legislative history to particular privileges, *see* S.Rep. at 9; H.R.Rep. at 10, we do not believe that "privileged" and "confidential" should be treated as synonymous.

We have found only two district court cases holding information to be privileged under Exemption 4 and both involve the attorney-client privilege, which is explicitly mentioned in the legislative history of Exemption 4. *Indian Law Resource Center v. Department of the Interior,* 477 F.Supp. 144, 148 (D.D.C.1979) (alternative holding); *Miller, Anderson, Nash, Yerke & Wiener v. United States Dep't of Energy,* 499 F.Supp. 767, 771 (D.Or.1980) (alternative holding).

consider at length, in light of the legislative history and purposes of FOIA, whether or not to recognize the confidential commercial information privilege under Exemption 5. *Id.* at 355–60, 99 S.Ct. at 2809–12.

We expect, under Exemption 4 as under Exemption 5, that discovery rules will provide only rough analogies, and that a particular privilege should be incorporated only after careful consideration of the language and legislative history of Exemption 4, its relationship to other exemptions, and the general disclosure mandate of FOIA. We express no view on the outcome of that analysis for the confidential report privilege relied on in *Women in Science.*

### 2. The Test for Confidentiality

Under the standard test in this circuit, commercial or financial information is "confidential" under Exemption 4 if disclosure is likely "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks & Conservation Association v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974) (*National Parks I*) (footnote omitted).[51] The test is an objective one and the government's promise of confidentiality is not dispositive. *Id.* at 766.

In this case, the government concedes that disclosure will not cause competitive harm,[52] and the conflict of interest information is sufficiently important to be "neces-sary." Thus the only issue is whether disclosure is likely to impair the government's ability to obtain similar information in the future.

As an initial matter, it might be thought that since consultants *must* complete Form 474, the government's ability to obtain information cannot be impaired. *National Parks I* supports this view. We stated:

> Since the concessioners are *required* to provide this financial information to the government, there is presumably no danger that public disclosure will impair the ability of the government to obtain this information in the future.

*Id.* at 770 (emphasis in original). In contrast, in *Women in Science,* we noted that:

> "[T]hose who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests."

566 F.2d at 346 (quoting *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974)).[53]

In our view, whether disclosure is mandatory is certainly a factor in deciding whether the government's access to information is likely to be impaired. If the government can enforce the disclosure obligation, and if the resultant disclosure is likely to be accurate, that may be sufficient to prevent any impairment. In this case, the government can readily enforce the disclosure duty. But, if only because Form 474 leaves room for interpretation of which financial interests "relate directly or indirectly to your

---

**51.** *Accord Continental Oil Co. v. FPC,* 519 F.2d 31, 35 (5th Cir. 1975); *Continental Stock Transfer & Trust Co. v. SEC,* 566 F.2d 373, 375 (2d Cir. 1977).

We reserved in *National Parks I,* have not since decided, and do not decide here the question "whether other governmental interests are embodied in this exemption." 498 F.2d at 770 n.17. In particular, we do not decide whether it is proper to take into account the government's need to attract qualified scientists, who might choose not to seek consulting positions in order to avoid public disclosure of Form 474's financial information. The government did not ask us in this case to consider including that specific interest in the *National Parks I* test. *See* Government's Brief at 13 n.10. *But see* Affidavit of Robert Eaglesome, *supra* note

8, ¶ 7 (expressing his view that "[w]ithout assurances of confidentiality ..., significant numbers of persons may not apply for the advisory board or committee positions").

**52.** Government's Brief at 13 n.10.

**53.** *See also Green v. Department of Commerce,* 468 F.Supp. 691, 693 (D.D.C.1979), *app. dismissed,* 618 F.2d 836 (D.C.Cir.1980), where the court distinguished *National Parks I* and noted that it would be "unrealistic" to assume that a statutory obligation to provide the government with information guarantees that information will in fact be provided, at least "when the Government lacks the means to compel strict enforcement."

consultancy duties," we cannot dismiss the possibility that part-time consultants may construe Form 474's disclosure requirement narrowly and thus may not disclose all possible conflicts of interest. Thus, despite the compulsory nature of the disclosure, we believe the possibility of impairment merits further analysis.[54]

Turning finally to the likelihood of impairment, the government relies primarily on our statement in *Women in Science,* 566 F.2d at 346, that disclosure of the information on Form 474 "very likely would impair the Government's ability to acquire this information in the future." We, on the other hand, do not believe that this conclusion, drawn in the context of another case and based on the record in that case, is dispositive or even very helpful. In *Women in Science,* the district court, in the course of a one-page order, made an unexplained factual determination that disclosure "would impair the government's ability to acquire this information in the future,"[55] and we affirmed that finding on appeal. But what was true then need not be true today. In particular, a decision today on impairment must take into account Congress' view, in passing the Ethics in Government Act of 1978, that the benefits of public disclosure of the finances of highly placed government officials outweigh the costs in invasion of privacy, deterring people from accepting government jobs, and possible inaccurate disclosure.[56]

■ Even more important, in *Women in Science,* neither we nor the district court stated the *extent* to which the government's ability to obtain information would be impaired. A minor impairment cannot overcome the disclosure mandate of FOIA. Rather, the question must be whether the impairment is significant enough to justify withholding the information. *Cf. Pacific*

*Architects & Engineers Inc. v. Renegotiation Board,* 505 F.2d 383, 385 (D.C.Cir.1974), where we remanded an Exemption 4 claim for a detailed factual inquiry into, among other things, "the extent to which disclosure ... will impair the government's ability to obtain necessary information of this type in the future."

■ This inquiry necessarily involves a rough balancing of the extent of impairment and the importance of the information against the public interest in disclosure. We do not decide today the details of the balancing process.

■ Apart from relying on the finding of impairment in *Women in Science,* the government produced no evidence except a conclusory affidavit by the HHS director of personnel policy. Thus, the government has not yet established its Exemption 4 claim. On the other hand, we cannot say that it will be unable to do so. The district court, of course, made no finding on the extent or even the fact of impairment. We therefore remand to give the government an opportunity to provide the detailed factual justification for withholding under Exemption 4 required by *Pacific Architects & Engineers.*

### IV. CONCLUSION

Release of the information on Form 474 will not constitute a clearly unwarranted invasion of personal privacy under Exemption 6. Whether the list of financial interests is confidential under Exemption 4 is a matter for factual determination on remand. The decision of the district court is *reversed* as to Exemption 6 and *reversed and remanded* as to Exemption 4.

TAMM, Circuit Judge, dissenting:

Few areas of the corpus of federal law have given rise to the need for a greater

---

54. Judge Tamm, the author of both *National Parks I* and *Women in Science,* concurs in this view. *See post* at 284. (Tamm, J., dissenting) ("a statutory obligation to provide the information is simply a factor to be considered in determining whether any functional impairment will ensue").

55. *Association of Women in Science v. Weinberger,* No. 74–401, Order (Apr. 24, 1975), *aff'd,* 566 F.2d 339 (D.C.Cir.1977), *reprinted in* Joint Appendix at 146, *Women in Science.*

56. *See* notes 41–46 *supra* and accompanying text.

number of borderline calls than has the application of the exceptions to the general disclosure mandate contained in the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976). In the case at bar the court is asked to order the release of information the disclosure of which might well serve the important function of averting possible conflicts of interest among individuals in the employ of the federal government; yet the agency that holds the information convincingly argues that public officials do not forfeit all rights to privacy by taking on the sobriequet of federal employee. The district court ruled that appellant Washington Post Company was not entitled to certain financial data filed with appellee Department of Health and Human Services (HHS) by the members of the advisory boards and committees of the National Cancer Institute (NCI). In light of my agreement with the district judge's analysis of the applicability of the FOIA privacy exemption to this case, I must respectfully dissent from the majority's reversal of his decision on that point. In the alternative, I would also hold that the requested information is exempt under FOIA Exemption 4 as "financial information obtained from a person and privileged or confidential."

## I. BACKGROUND

The National Cancer Institute, a division of the National Institutes of Health, was established by the Congress to facilitate the Nation's struggle with cancer.[1] With a budget of nearly one billion dollars, the NCI conducts its own research into the causes and cures of cancer and also supports similar research by other organizations; indeed, most of the funds appropriated to the NCI are in turn distributed to other research entities in the form of grants and contracts.

To assist the Director of the NCI in selecting and monitoring the recipients of federal funds, a variety of boards and committees exist that are staffed by experts in scientific fields. The most important of these boards, the National Cancer Advisory Board, is specifically empowered by Congress to "review applications for grants for research projects relating to cancer and to recommend to the Director [of the NCI] . . . those applications which show promise of making valuable contributions to human knowledge with respect to the cause or prevention of cancer . . . ." 42 U.S.C. § 286b(b)(3) (Supp. III 1979). In like manner other committees sit, frequently on an ad hoc basis, to make recommendations regarding the manner in which the NCI funds should be allocated.[2]

The power of the NCI advisory boards and committees is readily apparent. Although, as a technical matter, these groups make only "recommendations" to the Director with regard to grant applications, in practice these recommendations are the final word on fund allocation. As this court has earlier had occasion to note, these boards and committees "are composed of distinguished members of the medical and scientific communities whose function is to exercise 'peer review' over pending grant applications." *Association for Women in Science v. Califano,* 566 F.2d 339, 341 (D.C. Cir.1977). I would also note that the compensation for the services rendered by the advisory board and committee members is comparatively nominal. Although individuals serving in such "special" government service do receive a per diem sum currently set at the pro rata GS–18 daily rate,[3] the great majority work but a few days a year in their advisory capacities.

However one styles the functions of the NCI committees and boards, their collective power of resource allocation is great. The federal government, not unaware of the

---

1. The current statutory provisions governing the operation and funding of the National Cancer Institute (NCI) are found at 42 U.S.C. §§ 281–286e (Supp. IV 1980).

2. For a discussion of the workings of the grant application review process within the National Institutes of Health, *see Grassetti v. Weinber-*

*ger,* 408 F.Supp. 142, 147–49 (N.D.Cal.1976); *see also* Adler, *The Impact of FOIA on Scientific Research Grantees,* 17 COLUM. J. L. & SOC. PROBS. 1, 12–13, 15–16 (1981).

3. *See* 42 U.S.C. § 286b(a)(8) (Supp. III 1979).

frailties of human character even among the learned in the scientific community, has recognized the possibilities for abuse inherent in any scheme whereby individuals are accorded discretionary power to bestow grants on others, particularly when those "others" are frequently their academic and scientific peers. In 1965 President Johnson signed Executive Order 11222, which prescribes certain ethical standards for government officers and employees. Exec. Order No. 11222, 3 C.F.R. 306–311 (1964–65 Comp.). Acting under the authority of Order 11222, the Department of Health, Education and Welfare, the predecessor agency to HHS, promulgated regulations governing the conduct of "special government employees"; this "special employee" classification includes the advisory board and committee members of the NCI. 45 C.F.R. §§ 73.735–902 to –1007 (1981). One of these regulations, 45 C.F.R. § 73.735–902(a) (1981), requires each special employee to submit a "confidential statement[ ] of employment and financial interests." *Id.*

To facilitate the submission of this statement, the Department of Health, Education and Welfare produced Form 474, entitled "Confidential Statement of Employment and Financial Interests." Appellant's Appendix (A.A.) at 21–22. As a precondition of employment, each member of an NCI advisory board or committee is required to complete Form 474. The critical section of that form is its Part II, which demands that each appointee to a special position list (1) all other federal government employment; (2) all non-federal employment; and (3) all "organizations in which you, your spouse, minor child, partner, or an organization with which you are connected have financial interests which relate directly or indirectly to your consultancy duties." *Id.* at 22. Officials of the federal government in turn review each completed Form 474, and, in Part III of that document, those officials are directed to conclude whether any conflict of interest appears to exist. *Id.*

Appointees to special government positions are specifically advised by a statement contained on Form 474 that the information submitted will be held in confidence and will not be subject to disclosure unless "good cause" is shown.[4] This pledge of confidentiality is founded on Executive Order 11222 itself,[5] and on the implementing regulations of the Office of Personnel Management[6] and HHS.[7] Thus, Form 474 envisages an "in-house" search for conflicts of interest. Appointees to special positions are aware that the information submitted will be scrutinized by federal officials concerned with the possibility of ethical impropriety; such appointees are also led to believe, however, that the information will not be subject to general disclosure in the absence of a demonstration of "good cause."

On February 14, 1980, appellant Washington Post Company requested that HHS provide access to the Form 474 completed by each member of an NCI advisory board

---

**4.** The full pledge of confidentiality is contained in Form 474's "Information to Appointee" section, which provides, in pertinent part, as follows:

*Information to Appointee:* Completion of this form is required for all experts and consultants and for other persons who work 130 days or less a year identified by the head of the principal operating component. The information to be furnished on this form is required by Executive Order 11222 and the regulations issued thereunder. The information you disclose will be used to determine whether a conflict exists between your employment and financial interests and the performance of your services for the Government. The information will be held in confidence and will not be disclosed except as the Chairman of the Civil Service Commission or the head of the principal operating compo-

nent or designee may determine for good cause. The information may be used: a) by a Federal, state or local agency when there is an indication of a violation or potential violation of law; b) by a Federal agency in deciding on the hiring or retention of an employee or other benefit; or c) for other routine uses published in accordance with 5 USC 552a. Unless you provide the information requested on this form, the organization will not be able to utilize your services.

Appellant's Appendix (A.A.) at 21.

**5.** *See* Section 405, Exec. Order No. 11222, 3 C.F.R. 309 (1964–65 Comp.).

**6.** *See* 5 C.F.R. § 735.410 (1982).

**7.** *See* 45 C.F.R. § 73.735–902(a) (1981).

or committee. An official of HHS denied appellant access to the disclosure forms, relying on the confidentiality provisions in Executive Order 11222 and OPM regulations and on the "invasion of privacy" exemption contained in the FOIA.[8] Appellant sought to reverse the denial within HHS, contending that the public interest in knowing of actual or potential conflicts of interest outweighed any privacy interests of special federal employees.[9] The Department, however, affirmed the initial denial of the request; it concluded that, while the public interest would be served only marginally by an outside review of the disclosure forms, unrestricted public access to the material would discourage individuals from accepting special federal appointments and from disclosing fully their financial interests.[10]

Having exhausted available administrative remedies, appellant filed suit in the district court to compel release of the disclosure forms. Although the government agreed to supply appellant with certain elements of the information requested, appellee adhered to its position of refusing to grant access to most of the material.[11] After both parties had filed detailed pleadings and affidavits, the district judge heard oral argument on cross-motions for summary judgment. In a memorandum opinion he ruled that, although HHS's reliance on FOIA Exemptions 3 and 4 was inapposite, the privacy exemption precluded disclosure of the forms. *Washington Post Co. v. HHS,* No. 80–1681, Memorandum Opinion (M.O.) (D.D.C. Dec. 4, 1980), A.A. at 33–36. This appeal ensued.

## II. THE PARTIES' ARGUMENTS AND THE RULING IN THE DISTRICT COURT

### A. The Parties' Positions

The government resists release of the disclosure forms through reliance on two of the FOIA's exemptions. HHS's principal argument is that Exemption 6, which permits the nondisclosure of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy,"[12] justifies the refusal to release the forms. The government argues that, in performing the balancing required under Exemption 6, the mild public interest that would flow from a public search for conflicts of interest among NCI special employees is more than outweighed by the potential invasion of those employees' legitimate expectations of privacy in their financial and employment disclosure forms.

In response, appellant contends initially that the forms at issue are not "personnel . . . [or] . . . similar files" and thus are not entitled to any protection whatsoever under Exemption 6. In the alternative, appellant submits that the invasion of privacy involved is not, under all the circumstances, "clearly unwarranted"; accordingly, disclosure is required given the indisputable public interest in monitoring the award of $1 billion of federal funds. Appellant further contends in this regard that employees of the federal government, even special, part-time ones, have only a limited privacy interest in their investments and forms of outside employment.

---

**8.** *See* Brief for Appellants at 4–5. The "invasion of privacy" exemption is, of course, Exemption 6, which provides for the nondisclosure of "personnel and medical files and similar files the disclosure of which would constitute clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1976).

**9.** Brief for Appellants at 5.

**10.** *See id.*

**11.** The government agreed, before the district court issued its opinion and accompanying order in the litigation, to release the following Form 474 information regarding appointees to

the NCI advisory boards and committees: (1) the names of the appointees, (2) the other positions of federal government employment those individuals may hold, and (3) the conclusions drawn by the reviewing officials as to whether conflicts of interest appear to exist in individual cases and the name of the reviewing employee in each case. *See Washington Post Co. v. HHS,* No. 80–1681, Memorandum Opinion (M.O.) at 1 n.1 (D.D.C. Dec. 4, 1980), A.A. at 33.

**12.** 5 U.S.C. § 552(b)(6) (1976).

The government also relies on Exemption 4 to ground nondisclosure. HHS submits that this exemption, which forbids the disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential," [13] bars the disclosure of the information irrespective of the severity of the potential invasion of the privacy interests of the submitters. Appellee submits that under Exemption 4 the critical inquiry is whether disclosure of the information would impair the ability of the government to obtain similar material in the future. Answering the question in the affirmative, HHS asserts that the FOIA does not require the release of the Forms 474.

Appellant demurs both to the categorization of the information contained on Form 474 as "commercial or financial" for the purposes of Exemption 4 and to the characterization of that information as "confidential" under the tests established by this court for the determination of such status. With regard to the first point, appellant contends that the information contained on Form 474 may not be deemed "financial" since that appellation has been limited to information that has a commercial nexus to the business or trade interests of the submitter. As for the "confidential" nature of the information, appellant contends that even complete disclosure of the Form 474 data would not in any way impair the government's ability to collect similar material in the future. Rather, appellant submits, the benefit conferred by the appointment to the NCI advisory boards would supply sufficient inducement to comply fully with the disclosure mandates of the government even with complete disclosure to the public of the Form 474 data.

## B. *The District Judge's Ruling*

In granting the government's motion for summary judgment, the district judge relied exclusively on the personal privacy protection contained in Exemption 6. Exemption 4 was inapposite, he concluded, because

its primary emphasis is on the protection of information used by an individual or corporation in a commercial enterprise; the most recent decisions of this court indicated, he suggested, that Exemption 4 was not intended to apply to purely "personal financial information." [14] Similarly, Exemption 3 of the FOIA was not helpful to HHS because, as the district judge quite correctly found, it protects from release only information specifically exempted from disclosure by statute; in this case, of course, the only legal basis for nondisclosure, aside from the FOIA, is contained in an Executive Order and in federal regulations, neither of which meet the Exemption 3 standard.

Although he found the question of the applicability of Exemption 6 to the disclosure forms a close one, the district judge ruled that release of the data would constitute a clearly unwarranted invasion of privacy and upheld the government's position. Apparently assuming that the information contained in the Forms 474 constituted "personnel ... [or] ... similar files" for the purposes of Exemption 6, the trial judge correctly observed that the dispositive question in conducting the balancing required under that exemption is whether the severity of the privacy invasion outweighs the public interest in disclosure. Auguring in favor of release was the interest in public scrutiny of the Form 474 data as a means of discovering conflicts of interest among the members of the NCI advisory boards and committees. Favoring the individual's privacy interest, however, were (1) the fact the material had been obtained under a pledge of confidentiality, (2) the fact that personalized financial information has generally been held entitled to Exemption 6 protection, and (3) the pragmatic recognition that disclosure of the data might well discourage qualified appointees from accepting NCI advisory positions.

Although the district judge suggested that his resolution of the matter might have

---

**13.** 5 U.S.C. § 552(b)(4) (1976).

**14.** *Washington Post Co. v. HHS*, M.O. at 1–2 n.2, A.A. at 33–34.

been different had he been writing on "a clean slate," [15] he ruled that he was bound by a comparable balancing of interests done by this court in a case in which data found on Forms 474 were not disclosed. In *Association of Women in Science v. Califano,* 566 F.2d 339 (D.C.Cir.1977), we held that such information was privileged from disclosure in the context of a discovery request for production in pending litigation. As the district judge noted, *Women in Science* did not involve a request for information under the FOIA; he concluded, however, that the balancing of interests in the discovery context was equally apposite in the FOIA context. *Washington Post Co. v. HHS,* M.O. at 3–4, A.A. at 35–36. In *Women in Science* we held unanimously that the undisputed need of litigants for the information contained on the Forms 474 to demonstrate the existence of alleged conflicts of interest could not outweigh the privacy interests of those who submitted the information in reliance on a pledge of confidentiality.

There were, the trial court concluded, broad similarities between the balancing done in *Women in Science* and that required in the FOIA context. In both *Women in Science* and the case at bar, information was sought to determine whether federal grants were being awarded in a manner violative of conflict of interest standards. Similarly, in both cases those seeking the data could point to strong public purposes favoring disclosure; in *Women in Science* this purpose was the interest in full discovery to facilitate accurate rulings in litigation, while in the instant case it is the overriding policy of full disclosure underlying the FOIA. The only possible difference between the two cases, the district court

concluded, was in the nature of the interests that were to be balanced against the public interest in disclosure. In *Women in Science* the counter-balancing interest was the government's interest in ensuring the confidentiality of information submitted to it, while in the present case the interest to be balanced against the public's right to know must, under the applicable precedents, be the individual's interest in privacy. The district court overcame this absence of absolute congruence by concluding that the individuals' interests in privacy were so closely tied to the government's interest in the maintenance of confidentiality "that they may be regarded as identical for purposes of practical analysis." *Washington Post Co. v. HHS,* M.O. at 3–4 n.9, A.A. at 35–36. The district judge accordingly concluded that the two cases were substantially on all fours and upheld the agency's refusal to release the information.

## III. ANALYSIS

### A. *The Applicability of Exemption 6*

Inasmuch as the government's primary, and the district court's exclusive, emphasis centered on the applicability of Exemption 6 to the disclosure forms, I turn first to a consideration of that provision.

Cases in this court [16] and in others [17] have consistently stated that the applicability of Exemption 6 to agency records is predicated on the satisfaction of a two-step test. On one hand, the information must be "personnel," "medical," or "similar" files covered by the exemption. Then, assuming that the information in question meets that threshold standard,[18] the inquiry turns to whether

---

15. *Id.* at 3, A.A. at 35.

16. *See Board of Trade of Chicago v. Commodity Futures Trading Comm'n,* 627 F.2d 392, 396 (D.C.Cir.1980); *see also Washington Post Co. v. Department of State,* 647 F.2d 197, 198 (D.C. Cir.1981) (per curiam), *rev'd,* —— U.S. ——, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982); *Simpson v. Vance,* 648 F.2d 10, 12 (D.C.Cir.1980).

17. *Madeira Nursing Center, Inc. v. NLRB,* 615 F.2d 728, 730 (6th Cir. 1980); *Pacific Molasses Co. v. NLRB,* 577 F.2d 1172, 1178 (5th Cir.

1978); *Committee on Masonic Homes v. NLRB,* 556 F.2d 214, 219–20 (3d Cir. 1977); *Wine Hobby USA, Inc. v. IRS,* 502 F.2d 133, 135 (3d Cir. 1974); *Robles v. EPA,* 484 F.2d 843, 846 (4th Cir. 1973).

18. Most courts have described the inquiry that considers whether the information in question is included within the description "personnel and medical files and similar files" as the threshold issue. *See, e.g., United States Department of State v. Washington Post Co.,* —— U.S. ——, —— n.4, 102 S.Ct. 1957, 1961 n.4,

disclosure of the material would constitute an invasion of privacy that is "clearly unwarranted" under all the circumstances. To demonstrate the applicability of Exemption 6, the government must overcome each of these hurdles.

Until quite recently it was thought in this circuit that the threshold question whether the government records sought by a requester were "personnel," "medical," or "similar" files implicated a model of analysis comparable to that employed in determining whether disclosure of the information was under all of the circumstances "clearly unwarranted." In *Board of Trade of Chicago v. Commodity Futures Trading Commission,* 627 F.2d 392 (D.C.Cir.1980), for example, this court observed that there is an "essential interrelationship" between the question whether information meets the threshold test of inclusion under Exemption 6 as "personnel" or "similar" files and whether that information is properly subject to disclosure in light of the privacy exemption. *Id.* at 397. We there observed that both questions revolved around the common nucleus of legitimate, substantial privacy interests; both turned, we felt, in the first instance on whether disclosure of the information would compromise significant and reasonably founded privacy expectations.

A recent decision of the Supreme Court has, however, made all too clear that our determination of the standard properly applied in determining whether the threshold test of Exemption 6 coverage is met was erroneous. In *United States Department of State v. Washington Post Co.,* —— U.S. ——, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982), the Court branded our "intimate details" test an improper measure of when government records are "similar files." The Court agreed with the federal petitioners in that case and concluded that the "intimate details" test neither was mandated by Exemp-

tion 6 nor was an appropriate yardstick for determining the documents properly subjected to the "clearly unwarranted" balancing inquiry. *Id.* at 1959, 1961. Rather, the Court's scrutiny of the statutory language and the relevant history convinced it that "the phrase 'similar files' was to have a broad, rather than a narrow, meaning." *Id.* at 1960. Accordingly, the Court held that all government records containing information that applies to or identifies a particular individual satisfy the threshold test of Exemption 6, regardless of the type of file in which the information is contained. *Id.* at 1961.

Applying the broad threshold test mandated by the Supreme Court, there can be, as the majority concedes, no doubt that the information sought by appellant is contained in "personnel ... [or] similar files" for the purposes of Exemption 6. It is clear that the Forms 474 contain information applicable and directly relating to the financial and employment affairs of individuals, and the majority's rejection of appellant's position on this issue is clearly correct.

I turn, then, to what is in this case the more difficult of the Exemption 6 inquiries—whether the disclosure of the forms would constitute a "clearly unwarranted invasion of personal privacy." The Supreme Court in *Department of Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976), has made clear that, in conducting the balancing required under Exemption 6, the court is to weigh the "individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.' " As the district court correctly noted in its Memorandum in this case, the dispositive question in conducting this balancing is whether "the severity of the invasion of the personal privacy resulting from disclosure would outweigh the public interest in publi-

72 L.Ed.2d 358 (1982); *Church of Scientology v. Department of the Army,* 611 F.2d 738, 746–47 (9th Cir. 1979). In the *Board of Trade* case, however, the court observed that it is not always necessary to conduct the inquiry centering on file taxonomy as the initial one; rather,

immediate focus on the balancing required by the "clearly unwarranted" language may be appropriate where the balancing inquiry appears to lend itself to a readier resolution. *See Board of Trade,* 627 F.2d at 398.

cation." *Washington Post Co. v. HHS,* M.O. at 2, A.A. at 34. Furthermore, it is clear that the "clearly unwarranted" language of Exemption 6 expresses a " 'carefully considered congressional policy favoring disclosure' which 'instructs the court to tilt the balance in favor of disclosure.' " *Ditlow v. Shultz,* 517 F.2d 166, 169 (D.C.Cir. 1975) (quoting *Getman v. NLRB,* 450 F.2d 670, 674 & n.11 (D.C.Cir.1971)).

Appellant submits that the "paramount public interest in disclosure in order to instill public confidence in government" mandates disclosure of the financial and employment data at issue. Brief for Appellant at 21. I feel, however, that the district judge properly weighted this court's decision and remarks in *Women in Science* in upholding the government's refusal to release the information at issue. Although it is quite true that that case did not involve a balancing of interests employing the terminological conventions used in FOIA Exemption 6 cases, it is exalting form to heights unanticipated even by Rodin to suggest that our balancing there does not assist in the resolution of the case at bar.

*Women in Science* involved a balancing of the undisputed and quite significant need of private litigants for the information contained on the Forms 474 against the government's interest in the maintenance of confidentiality in those forms. As we there noted, the interests of the private litigants could hardly have been weightier; "[t]he existence of conflicts of interest . . . is the linchpin of [the litigants'] argument, and it is difficult to imagine anything more probative of this issue than the Forms 474." 566 F.2d at 343. The government's interests, however, were held sufficient to ground the assertion of the "confidential reports" privilege against disclosure through civil discovery. The harm that was expected to result to the government from disclosure—including the fear that appointees to whom no commitment of confidentiality was given would be less than candid and the related realization that qualified candidates might well not apply in the absence of a promise of privileged classification—was held to outweigh the litigants' significant need for the materials. 566 F.2d at 346–47.

The similarities between the *Women in Science* situation and the one before us are, I feel, striking, even if the mechanism for the request of the information is distinct. I am able to discern no fewer than six factors that, in my opinion, militate against disclosure of the financial and employment material found on the Forms 474.

**(1)** *The sensitive, personal nature of the information.*

In its recent *Washington Post* decision, the Supreme Court observed that Congress' primary purpose in enacting Exemption 6 "was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." 102 S.Ct. at 1960. As Professor Kronman has recently had occasion to note in considering the scope of Exemption 6: "The first interest protected by the exemption (and judging from the legislative history of the act, the one its draftsmen had most clearly in mind) is the interest individuals have in concealing—or more neutrally, in retaining the power to selectively disclose—embarrassing facts about themselves." [19] This court had occasion to note in *Rural Housing Alliance v. Department of Agriculture,* 498 F.2d 73, 77 (D.C.Cir.1974), that Exemption 6 "was designed to protect individuals from public disclosure of intimate details of their lives . . . [and is] phrased broadly to protect individuals from a wide range of embarrassing disclosures."

The problem, of course, with these general statements of purpose—and, for that matter, with the hortatory observations of courts construing Exemption 6 quoted by the majority—is that they provide only limited guidance in determining whether, in any particular case, the disclosure requested

---

**19.** Kronman, *The Privacy Exemption to the Freedom of Information Act,* IX(4) J. Legal Stud. 727, 739 (1980) (footnote omitted).

would be "clearly unwarranted." Indeed, the decisionmaking process under Exemption 6 has, I believe, quite correctly been said to possess a certain ad hoc quality. *See Rose v. Department of the Air Force,* 495 F.2d 261, 266 (2d Cir. 1974), *aff'd,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *see also* 2 J. O'REILLY, FEDERAL INFORMATION DISCLOSURE § 16.01, at 16–2 to 16–3 (1979). That this should be the case is, in my opinion, eminently understandable; the balancing that Exemption 6 demands in each case must, virtually of necessity, be ad hoc.

It is rather easy to formulate the question that must be answered in every Exemption 6 case: the court must determine whether the severity of the invasion of privacy outweighs the public interest in disclosure. While this question may be succinctly stated, it defies, I believe, an attempt at reduction to a neat, concise, and well-focused balance. Rather, the attempt to reduce the factors allegedly germane in the Exemption 6 context appears to me to be an untenable effort to transform the fluid idea of a "clearly unwarranted" invasion of privacy into a rigid ideology that might result in the disclosure of even indisputably personal information where a particular government party is unable to fit its round pegs into the square holes established by this court. Indeed, I can think of few areas in the corpus of federal law in which the time-proven axiom *ex facto jus oritur*—"out of facts spring the law"—is any more apposite.

The focus of this and every other court in an Exemption 6 case must be on the respective public and private interests at stake. *See Washington Post,* 102 S.Ct. at 1960. After carefully studying these interests, I am compelled to conclude that the district judge was eminently correct in upholding the government's claims that Exemption 6 grounded nondisclosure of the Forms 474. For many, if not most, individuals details of personal financial strategies are intensely personal matters. Few individuals publicize, at least voluntarily, the scope of their investments; rather, such matters are typically maintained with the greatest of privacy. Similarly, for a variety of motives, reasonable, law-abiding citizens may be reluctant to disclose their employers; indeed, it is not unreasonable to surmise that that might particularly be the case where the individuals perform ad hoc consulting functions, as undoubtedly do many of those who submit Form 474 to the NCI. Any one of us can easily imagine circumstances under which disclosure of the contours of our employment relationships or of the details of our personal investments—or those of our families—would prove highly embarrassing; precisely the same values and concerns obtain with regard to the data submitted on the Forms 474. As Professor Kronman's observations noted above make abundantly clear, these concerns of embarrassing revelations are at the heart of the personal privacy exemption to the FOIA.

Thus, I demur strongly to the majority's contention that the revelation of the employment and financial data in question would infringe only minor and insignificant privacy interests of the appointees. The implicit basis of this court's decision in *Women in Science* was the conclusion that the data at issue partook of a sensitive, personal nature that would lead reasonable individuals to desire that the information not be disclosed. We reached that conclusion in *Women in Science* notwithstanding the fact that a poll conducted by appellants in that case indicated that eighty per cent of the NCI appointees would not have objected to the disclosure. Both appellant in the case at bar and, with respect, the majority miss the point of this poll, the accuracy of which no one appears to dispute: *to argue that because four-fifths of those polled would not object to disclosure suggests that the infringement of privacy interests would collectively be minor ignores totally the interests of the forgotten twenty per cent.* It is beyond any cavil that Exemption 6 was drafted and enacted to protect against the disclosure of *embarrassing information;* that eighty per cent of the appointees apparently are not in a position to be embarrassed is, in my opinion, utterly irrelevant to the determination of whether

disclosure of the information submitted by the remaining twenty per cent *would* be "clearly unwarranted."

When one combines the fact that many of the appointees apparently *would* object to the disclosure of the Form 474 data with the fact that the government promised *all* of the appointees that the information would not be disclosed without "good cause," *see infra* pp. 278–279, the error committed by the majority in declining to recognize the applicability of Exemption 6 to the data is manifest. Thus, even if the majority is correct in straitjacketing the Exemption 6 inquiry to the public interests *favoring* disclosure, ignoring those interests of the public militating against release, I cannot agree that disclosure of the information is proper. Although I could further articulate the depths of my disagreement with the majority's conclusions regarding the importance of the privacy interests implicated by the Form 474 data, I need not belabor the point: financial and employment information of the type at stake on the Forms 474 implicates important privacy interests that carry significant weight on the Exemption 6 scales.

Moreover, we should not forget—as I believe the majority conveniently does—that the submitter of the Form 474 data does not provide information regarding only his own financial affairs. Rather, he is directed to provide a listing of all organizations the interests of which might relate to his consultancy duties, and in which his spouse, child, partner, or affiliated organization has an interest. That the invasion of privacy affects not simply the provider of the information, but his or her family as well, further militates, in my opinion, against disclosure.

(2) *The pledge of confidentiality.*

Courts faced with difficult issues arising under the FOIA have frequently ventilated the effect of a government commitment of confidentiality made to a submitter of information. On one hand, it is clear that a promise of confidential treatment is a "factor to be considered" in determining wheth-

er release of material is "clearly unwarranted." *Robles v. EPA,* 484 F.2d 843, 846 (4th Cir. 1973); *see Ditlow v. Shultz,* 517 F.2d 166, 172 & n.22 (D.C.Cir.1975). On the other hand, it is equally clear that such a promise cannot in and of itself override the disclosure mandate of the FOIA. *Ackerly v. Ley,* 420 F.2d 1336, 1339 n.3 (D.C.Cir. 1969); *see Legal Aid Society of Alameda County v. Shultz,* 349 F.Supp. 771, 776 (N.D. Cal.1972) (Exemption 3 context). In each case the court must determine whether Exemption 6 was properly invoked in light of all the surrounding circumstances. Any other rule would permit the federal government's printing press to circumvent the clear disclosure directive of the Act.

Appellant notes that the commitment of confidentiality made in the instant case was not absolute; rather, the implementing regulations, and the Form 474 itself, made clear that the information submitted could be disclosed by the government for "good cause shown." 5 C.F.R. § 535.410 (1981); Form 474, A.A. at 21. This limited privilege of disclosure without doubt lessens somewhat the expectation of privacy that those who submitted the forms could reasonably maintain. Yet again, this court should, I believe, be mindful of the language and reasoning employed by the *Women in Science* court in gauging the effect of the identical commitment of confidence. There, we observed that the representations of the government *are* significant because "the public should be able to expect its government to honor obligations made to induce full and accurate information." *Women in Science,* 566 F.2d at 344 n.21; *accord, National Parks and Conservation Association v. Morton,* 498 F.2d 765, 768 (D.C.Cir.1974) (Exemption 4 context). Although the court is, of course, now considering the Form 474 information with regard to the applicability of Exemption 6, I am of the opinion that the commitment should be accorded similar deference in that context.

In determining the efficacy of a pledge of confidentiality in a given case, it will usually be necessary to examine all the surround-

ing circumstances to discover the extent to which the pledge induced the submission of the information; if the information is neither of a sensitive nature nor apparently submitted in reliance on the pledge of secrecy, then the promise of confidentiality should be given only limited weight in the calculus of Exemption 6 balancing. In the instant case, however, the surrounding circumstances suggest that the pledge of confidentiality may well have been of considerable import in inducing the submission of the financial and employment data. As I shall discuss below,[20] this is not a case in which the provider of the information receives, as a quid pro quo, a significant government benefit; the limited remuneration supplied the advisory board members makes rather clear that, as is the case in other areas of federal service, one does not serve the government with an eye toward great riches.

On the contrary, this situation is one in which the providers of the data might well have placed considerable reliance on the promise of confidentiality. The advisory board and committee members serve as part-time employees of the federal government and presumably could have declined the proffered opportunity to serve if the "conditions" of employment were altered. In a case such as this one, it would thus appear that a pledge of confidence should be given great weight. The *Women in Science* court stated that the matter succinctly and correctly: private citizens should be able to rely on the promises of their government.

(3) *The limited compensation afforded the advisory board members.*

As I have suggested above, the part-time nature of the advisory board members' affiliation with the federal government militates against disclosure of the Form 474 data. I would view this case in a dramatically different light if the submitters of the data in question worked in a full-time capacity for the government and therefore received greater compensation for their federal work. In contrast to appellant's suggestion that the advisory board members are accorded "an important benefit" in appointment to an NCI committee, I believe that few individuals would participate on the NCI boards were a selfish commitment to personal gain the primary motivation. Although I harbor no delusions regarding the vagaries of human character, the reports of the demise of altruism are, I believe, exaggerated.

(4) *The internal review scheme.*

Further militating against the release of the Form 474 data is the existence of the NCI's own internal review scheme for ferreting out conflicts of interest. Appellant complains that such an in-house review inadequately protects against the abuses that may result from selfish practices by the advisory committee members; outside, independent scrutiny is necessary, it argues, to provide an additional check on the baser impulses of those committee or board members.

Although I concede, at least *arguendo,* that additional levels of scrutiny might well illuminate apparent or actual conflicts of interest overlooked by government officials, I do not share appellant's doubt of the competence and integrity of the federal employees who examine the Form 474. The important question in the current context is not, of course, whether scrutiny by the Washington Post Company or by any citizen might shed additional light on self-serving practices engaged in by advisory board members. The critical inquiry is rather whether the *marginal* gain from such scrutiny outweighs the significant privacy interests that would be infringed by disclosure of the Form 474 data. The existence of the in-house review process provides an important and vital constraint on the activities of advisory board and committee members. I am not convinced, however, that additional outside scrutiny would contribute significantly to the attainment of the desideratum of deterring conflicts of interest.

**20.** *See infra* p. 279.

(5) *The incongruity of the release of the Form 474 data with the result in Women in Science.*

While the judicial decisions of the past few years have made it amply clear that the law of civil discovery and the doctrines applied under the FOIA do not form a seamless web, the interplay of the two modes of information provision cannot be ignored. In our 1977 *Women in Science* decision, we concluded that a privilege that inured to the government's benefit in the civil discovery context barred disclosure of the data contained on the Forms 474 in question. 566 F.2d at 346–48. Appellant argues in the case at bar, however, that the same documents found privileged from disclosure in that case must now be released under the FOIA. The practical conundurm to which this line of argument leads is obvious: appellant in effect contends that, if the *Women in Science* plaintiffs had sought the information under the FOIA instead of through the rules of civil procedure, they would have succeeded in securing the data.

I decline to adopt this view, notwithstanding the nostalgia it induces for the time spent at law school considering the minutia of the common law writ system. It is quite clear that, if the FOIA mandates the provision of the Form 474 information, our *Women in Science* opinion is hardly worth the paper on which it is printed in the *Federal Reporter.*

The majority conveniently ignores the incongruity today's result creates with our earlier *Women in Science* holding; with the magic wand of rhetoric the court simply concludes that the fact that precisely the same data was ruled privileged from discovery is inapposite to the Exemption 6 analysis. To be sure, it is true that the questions of availability of information from the government are distinct where the mode of provision is on one hand civil discovery and on the other the FOIA. *See Playboy Enterprises v. Department of Justice,* 677 F.2d 931, 936 (D.C.Cir.1982). It is also true, however, that the FOIA neither

expands nor contracts existing discovery privileges, *see Chamber of Commerce of the United States v. Legal Aid Society of Alameda County,* 423 U.S. 1309, 1310–11, 96 S.Ct. 5, 6, 46 L.Ed.2d 14 (Douglas, Circuit Justice, 1975). Moreover, the approach adopted by the majority encourages, in my opinion, parties in litigation against the government to bypass the stipulated discovery process in favor of the FOIA. The majority's systematic refusal even to concede that the fact that information was deemed privileged from discovery has a bearing on whether the same information is exempt under the FOIA is, in my opinion, gravely in error. In effect, the court's message to parties involved in litigation against the government is clear: where disclosure of information is sought and the question of privilege is a close one, disregard the carefully crafted discovery rules applicable to the government and use the more liberal FOIA rules.

It is, of course, easy to criticize another's analytic approach in an area as complex as this one, and, like the majority, I will not attempt to delineate the precise relationship between the government's discovery privileges and the duties imposed by the FOIA. I would simply conclude that I for one am most hesitant to reach a result that would, in effect, eliminate the government's qualified privilege that we held in *Women in Science* attached to the Form 474 data.

(6) *The "public harm" that might result from disclosure.*

The primary thrust of appellant's attack on the district court's reasoning is that the judge improperly equated the government's interests in the flow of information and in attracting qualified candidates with the individual privacy interests of the Form 474 submitters. Appellant quite correctly notes that, in performing the Exemption 6 balancing, the government's interests are irrelevant; the balancing to be done is between the public's "need to know" and the relevant privacy interests at issue.[21] Accord-

21. "The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that

ingly, appellant contends that the erroneous equation of governmental and privacy interests led the district judge to consider factors that should play no role in the Exemption 6 calculus, such as the possible inhibition of qualified applicants from accepting NCI advisory board positions.

Perhaps the most troubling and difficult issue in the case at bar is the matter of the weight, if any, that should be accorded the fact that disclosure of the Form 474 data might well deter qualified applicants from accepting NCI advisory board positions and might inhibit the flow of accurate information to the government. As we noted in *Women in Science,* this is a matter of no small moment; even individuals with "nothing to hide" might be hesitant to accept an NCI position out of a fear that the details of their financial and work lives would provide the grist for a newspaper reporter's mill. As the district judge in the instant case sapiently observed, appellant's suggestion that only a few "undesirables" would resist the acceptance of an NCI position because of the general availability of the Form 474 data is as prescient as the argument that only the guilty would take the benefit of the testimonial privilege against self-incrimination. *Washington Post Co. v. HHS,* M.O. at 2, A.A. at 34.

At least one court has taken the position, however, that the "public harm" that might result from disclosure of information under the FOIA is an illegitimate concern where the scope of the personal privacy exemption is at issue.[22] To some extent, the rejection of the "more harm than good" argument is understandable; the "public harm" contention is an open-ended one that might well be offered as a makeweight by the government in every Exemption 6 case.

Decisions of other federal courts suggest, however, that consideration of the public harm that might flow from disclosure of certain requested information is not illegitimate in all contexts. In *Church of Scientology v. Department of the Army,* 611 F.2d 738, 746 (9th Cir. 1979), the court observed that other courts had taken cognizance of "the potential harm from disclosure" in carrying out the Exemption 6 balancing. In *Lamont v. Department of Justice,* 475 F.Supp. 761, 782 (S.D.N.Y.1979), the court concluded that in conducting the Exemption 6 balancing it was appropriate to consider the public harm that would flow from disclosure of information held by the FBI regarding informants and surveillance. The district judge concluded in *Lamont* that a "public harm might accrue [from disclosure], as 'it is doubtful that many would be willing to give information at all if they could not be assured of such privacy.'" *Id.* (quoting *Flower v. FBI,* 448 F.Supp. 567, 571–72 (W.D.Tex.1978)).[23]

Although I do not wish to mandate the inclusion of a new element in the Exemption 6 balancing process, I think it wrong to foreclose completely consideration of the important public interest in securing talented, qualified appointees to staff the NCI advisory boards. In the *Women in Science* case, we in no uncertain terms made clear our collective fear that disclosure of the Form 474 data might impair the ability of the government to obtain qualified appointees and similar information in the future. It would accordingly seem most strange to

will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

**22.** In *Robles v. EPA,* the court opined that the argument that disclosure "would do more harm than good" was irrelevant in the personal privacy context. 484 F.2d at 847. The court in that case went on to note, however, that the claim of public harm was, on the facts there, "at best ambiguous." *Id.* By contrast, in the case at bar we must take account of a prior decision of this court concluding, admittedly without a detailed factual basis, that disclosure of the Form 474 data would likely impair the government's ability to acquire comparable information and qualified appointees in the future. *See Association for Women in Science v. Califano,* 566 F.2d 339, 346–47 (D.C.Cir.1977). I would find the *Robles* facts, if not that decision's rhetoric, distinguishable from the situation in the instant case.

**23.** *See also Holy Spirit Ass'n v. Department of State,* 526 F.Supp. 1022, 1034 (S.D.N.Y.1981).

me if this court were proscribed, in conducting the fluid balancing required under Exemption 6, from taking any account of possible deleterious effects of disclosure. To be sure, I would not accord too much significance to this factor, for the contention that the citizenry would be better off not knowing certain matters has a potential for perniciousness that no court should ignore. To ignore the public harm that might result from disclosure, however, is to adopt an ostrich-like approach to the Exemption 6 balancing process that is inconsistent with a full and intelligent consideration of all factors relevant to the "public interest in disclosure."

Accordingly, I would hold that the data at issue in this litigation is exempt from disclosure under Exemption 6.

## B. The Applicability of Exemption 4.

The district court rejected the government's reliance on Exemption 4[24] as a ground for nondisclosure of the Form 474 data, concluding that that exemption does not apply to "personal financial information." *Washington Post Co. v. HHS,* M.O. at 1–2 n.2, A.A. at 33–34. I believe, however, that the language of Exemption 4 does provide an alternative ground for the nondisclosure by HHS of the material contained in the "Financial Interests" section of the Form 474.

In *National Parks and Conservation Association v. Kleppe,* 547 F.2d 673, 685–86 (D.C.Cir.1976) (*National Parks II*), we observed that Exemption 4 is not primarily concerned with the protection of personal privacy interests, a view to which I adhere. We did not in that case, however, express any conclusion regarding the extent to which personal commercial or financial information might be protected under Exemption 4 if the material was "obtained from a person" and "privileged or confidential."[25] Moreover, although the clear majority of Exemption 4 cases have involved information generated in a commercial context, the language of the exemption draws no distinction between financial information relating to an individual's personal activities and such information relating to a business or commercial enterprise.[26] Thus, the fact that the information at issue is personal in character does not *ipso facto* render the fourth FOIA exemption inapplicable; the reviewing court must still apply the tests demanded by the statute and the implementing case law to determine the protection, if any, afforded by Exemption 4.

Decisions in this circuit have consistently stated that, aside from trade secrets, Exemption 4 applies only to information that is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confi-

**24.** Exemption 4, of course, limits the release of "trade secrets and commercial or financial information obtained from a person and privileged or confidential information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4) (1976). *See* text at note 13.

**25.** *See id.*

**26.** The consideration accorded the exemption in the House and Senate Reports suggests that non-commercial information might well be protected under Exemption 4. The Senate Report stated, for example, that Exemption 4:

is necessary to protect the confidentiality of information which is obtained by the Government through questionnaires or other inquiries, but which would *customarily not be released* to the public by the person from whom it was obtained.

S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965) (emphasis added). In like fashion, the House Report stated that the exemption:

would assure the confidentiality of information obtained by the Government through questionnaires or through material submitted and disclosures made in procedures such as the mediation of labor-management controversies. It exempts such material *if it would not customarily be made public* by the person from whom it was obtained by the Government.

H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10, U.S.Code Cong. & Admin.News 1966, p. 2427 (1966) (footnote omitted) (emphasis added).

On the other hand, courts and commentators have contended that this broad language was based on proposed statutory language that differed from that actually incorporated into the final Exemption 4. *See Board of Trade,* 627 F.2d at 403 nn. 76–77. Without entering this particular semantic thicket, I believe it clear that Exemption 4 does not partake of an *exclusively* commercial gloss.

dential. *National Parks and Conservation Association v. Morton,* 498 F.2d 765, 766 (D.C.Cir.1974) (*National Parks I*); *see Board of Trade,* 627 F.2d at 403 & n.76. The individuals who submit the Form 474 data are clearly "persons" within the meaning of the language of Exemption 4.[27] Accordingly, the dispositive inquiries in the present case are whether the Form 474 information is "financial" for the purposes of the fourth exemption, and if so, whether that information is "privileged or confidential."

As the court noted in *Board of Trade,* the absence of legislative history defining the scope of the term "financial" has led courts to give that word its ordinary meaning. 627 F.2d at 403. By any definition, information relating to the financial interests of an appointee or his family members that is required to be listed on a disclosure form is covered. Although the precise amount of each investment is not required to be listed on the Form 474, the nature of the interest, the name of the entity, and the name of the individual in whose name the investment is held must be provided. Such information, with or without the actual investment sums listed, is indisputedly financial. The distinction between the requirement that the appointee note the ownership of *a certain amount* of corporate stock and the requirement that the holding of such stock simply be listed is one without a difference for Exemption 4 purposes; the distinction lacks sufficient significance to suggest that the disclosure of stock ownership is not "financial" in character.

Moreover, it is clear that in a variety of contexts purely personal financial information has been held to be "financial" for Exemption 4 purposes.[28] To be sure, in these cases the actual figures have been involved, but I do not believe that this distinction is decisive or even particularly important for characterization purposes. Finally, though hardly dispositive, I would also note that in applying a "common parlance" standard it would seem a bit peculiar to rule that information listed under the heading "Financial Interests" does not partake of a "financial" character.

I am not able, however, to hold that the listing of one's non-federal employment relationships is included within the ambit of the term "financial." Although it is true that the typical employment arrangement involves compensation, the mere listing of such relationships does not bear sufficient similarity to the pecuniary affairs of the individual to merit inclusion as "financial." Accordingly, the information submitted on the Forms 474 covering the appointee's non-federal employment should not be protected from disclosure by Exemption 4.

Considering only the information we have above held to be "financial" in character, I turn to the final, more difficult inquiry: whether the information is "privileged or confidential" for the purposes of Exemption 4. In the *National Parks I* case, we articulated the following test: financial matter is "confidential" if disclosure is likely either "(1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 498 F.2d at 770 (footnote omitted). Inasmuch as there is no concern with the "competitive position" of the submitters of the Forms

---

**27.** The "obtained from a person" language has been read to mean only that the information may not have been generated within the government for Exemption 4 to be applicable. *Board of Trade,* 627 F.2d at 403–04.

**28.** The leading case in this regard is *Rural Housing Alliance v. Department of Agriculture,* 498 F.2d 73 (D.C.Cir.1974), in which the court stated that "[w]hile it is true that exemption 4 is primarily a trade secrets exemption, it also protects individuals from disclosure of financial information which is privileged or confiden-

tial." *Id.* at 78. The *Rural Housing* litigation involved, in part, information relating to applications for government loans submitted by individual citizens. I do not read our subsequent cases as eliminating completely the possibility that Exemption 4 may be employed in a noncommercial context. *See also Bristol-Myers Co. v. FTC,* 424 F.2d 935, 938 (D.C.Cir.1970) (Exemption 4 "serves the important function of protecting the privacy and the competitive position of the citizen who offers information to assist government policy makers").

474, I address only the first prong of this test.

The test for confidentiality under Exemption 4 is an objective one, and neither the submitter's preference for secrecy nor the government's assurances to that effect can be dispositive. See *National Parks I*, 498 F.2d at 766–67. As the information in question is "necessary" for implementation of the government's in-house review for conflicts of interest, our focus properly turns to the likely effect of possible disclosure on future submissions of the material. The *National Parks I* court suggested that where, as here, the submitter of the information is *required* to supply it to the government, the concerned agency is precluded from asserting that its future ability to obtain the information will be impaired. 498 F.2d at 770. More recently, however, courts have suggested that a statutory obligation to provide the information is simply a factor to be considered in determining whether any functional impairment will ensue, see, e.g., *Green v. Department of Commerce*, 468 F.Supp. 691, 692–93 (D.D.C. 1979), and I adopt that conclusion.

In order for the government to sustain its burden of demonstrating that information is confidential for Exemption 4 purposes, we have stated that "specific factual or evidentiary material" must be adduced. *Pacific Architects and Engineers, Inc. v. Renegotiation Board*, 505 F.2d 383, 385 (D.C.Cir.1974). We have observed on several occasions that "[c]onclusory and generalized allegations are . . . unacceptable as a means of sustaining the burden of nondisclosure under the FOIA" in light of the adversarial difficulties posed by such statements and their inconsistency with the mandate of openness underlying the Act. *National Parks II*, 547 F.2d at 680; see *Pacific Architects*, 505 F.2d at 384–85; *Cuneo v. Schlesinger*, 484 F.2d 1086, 1092 (D.C.

Cir.1973), *cert. denied sub nom. Rosen v. Vaughn*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In the normal case, then, a remand—such as that ordered today by the majority—might well be required to provide a full factual hearing on the confidentiality question, as we do not, on the record before us, have a particularly detailed parsing of that issue.[29]

The existence of our *Women in Science* decision, however, renders this case most distinctly an unusual one. I may not timidly suggest that most FOIA Exemption 4 cases do not involve data about which a judicial finding that disclosure would impair the government's ability to obtain the information in the future has *already been made*. Precisely such a finding has been made, however, with regard to the information contained on the Forms 474. We stated in *Women in Science* that disclosure of the Form 474 information

very likely would impair the Government's ability to acquire this information in the future, for "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests . . . ." *United States v. Nixon*, 418 U.S. [683,] 705 [94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039] [1974].

566 F.2d at 346. The district judge in *Women in Science* drew a similar conclusion.[30]

In light of these special facts, I do not believe it necessary to remand this cause for a full ventilation of the confidentiality issue. The district judge and three judges of this court ruled in *Women in Science* that disclosure of the Form 474 data would impair the government's ability to obtain that information in the future. Although not a strict matter of collateral estoppel, I

---

**29.** In support of its contention that disclosure of the Form 474 data would impair the ability of the government to obtain such information in the future, appellees offered in the district court a single affidavit stating the conclusion to that effect of the Director of the Division of Personnel Policy of the Department of Health

and Human Services. See Affidavit of October 3, 1980, of Robert E. Eaglesome, *Washington Post Co. v. HHS*, No. 80–1681 (D.D.C. Dec. 4, 1980), A.A. at 24.

**30.** *See Association of Women in Science v. Califano*, 566 F.2d 339, 342 (D.C.Cir.1977).

see no need to order a detailed analysis of precisely the same question again.

Accordingly, I would hold that the Form 474 information relating to the financial interests of NCI appointees and their families is exempt from disclosure under FOIA Exemption 4.

## IV. CONCLUSION

The collective effect of the factors weighing against disclosure of the Form 474 information creates an imposing offset to the public interest in disclosure. Although it is clear that the release of the data would be consistent with the FOIA goal of the promotion of honesty in government,[31] that goal is also served in this case through the in-house program of review implemented by the government. To paraphrase Judge Learned Hand's famous standard for the determination of tort negligence, the gravity of the harm to the Form 474 submitters, discounted by its possibility, exceeds the public benefits that might flow from disclosure.[32] Thus, even with the *Getman* court's injunction to tilt the Exemption 6 balance in favor of disclosure, I would hold that release of the Form 474 data is, under the totality of the circumstances, clearly unwarranted. Similarly, I believe that there is ample room in the language of Exemption 4 to ground nondisclosure of the financial data at issue in this litigation.

In declining to order the release of the financial and employment information sought by appellant, I am primarily mindful that, in formulating the sixth exemption to the FOIA, Congress was keenly aware of the need "to protect certain equally important rights of privacy . . . ." S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965). The Exemption 6 balancing is designed to reconcile the public's right to know and individual rights of privacy "by excluding [from disclosure] those kinds of files the disclosure of which might harm the individual." H.R.Rep.No. 1497, 89th Cong., 2d Sess. 11, U.S.Code

Cong. & Admin.News 1966, p. 2428 (1966). As Chief Justice Burger recently stated in considering the FOIA exemptions, "[T]he Act expressly recognizes . . . that public disclosure is not always in the public interest . . . ." *Baldrige v. Shapiro,* 455 U.S. 345, 352, 102 S.Ct. 1103, 1108, 71 L.Ed.2d 199 (1982).

The overriding question in this case is whether, by accepting special, part-time employment in an advisory capacity with the National Cancer Institute, the eminent scientists, scholars, and community leaders surrendered to the public domain their right to have their financial and work lives remain private matters. I believe that the committee members did not forgo all privileges of "private" citizenship by this limited entree into public life, nor were they, in contrast to appellant's arguments, transmogrified into "public personages" by virtue of the acceptance of part-time government service. Even under the FOIA the public's right to know must, at times, be subordinated to the individual's right to be left alone. This is one of those cases.

---

**31.** *See* S.REP. No. 813, 89th Cong. 1st Sess. 3 (1965).

**32.** Judge Hand's observations on the American common law of negligence were made in the *United States v. Carroll Towing Co.,* 159 F.2d

169 (2d Cir. 1947). Professor Kronman is responsible for the intellectual leap forward of applying the *Carroll Towing* balancing standard to the Exemption 6 context. *See* Kronman, *supra* note 19, at 760.